REMINGTON ARMS COMPANY,
Plaintiff,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Defendant.

Civ. A. No. 89–420–JLL.

United States District Court,
D. Delaware.

Dec. 23, 1992.

See also, 810 F.Supp. 1420.

Donald E. Reid and Alan J. Stone of Morris, Nichols, Arsht & Tunnell, and Richard Allen Paul and Pamela Meitner of E.I. DuPont De Nemours & Co., Wilmington, DE, and Joanne B. Grossman, William F. Greaney and Martin Wald of Covington & Burling, Washington, DC, of counsel, for plaintiff.

Lawrence S. Drexler of Elzufon, Austin & Drexler, Wilmington, DE, and John C. Sullivan, Peter F. Rosenthal, Stephen F. Brock, Karen C. Buck, Geoffrey J. Alexander and Mark A. Welge of Manta and Welge, Philadelphia, PA, of counsel, for defendant.

### OPINION

LATCHUM, Senior District Judge.

## I. INTRODUCTION

On August 11, 1989, plaintiff Remington Arms Company ("Remington") brought this diversity action against defendant Liberty Mutual Insurance Company ("Liberty Mutual") seeking declaratory relief and damages. Docket Item ("D.I.") 1. The gravamen of Remington's action is that defendant Liberty Mutual breached its contractual duty to defend and indemnify Remington, under the comprehensive general liability insurance policies and excess policies that Remington had purchased from Liberty Mutual, with respect to claims brought against Remington for environmental contamination at three sites in Connecticut: Remington Park, Barnum Avenue, and Lordship Point. Liberty Mutual filed a motion for partial summary judgment on the grounds that the pollution exclusion clause, which is contained in the insurance policies purchased by Remington from 1971 to 1980, removes Liberty Mutual's duty to defend and indemnify Remington for environmental contamination claims arising from 1971 to 1980. Thus, the resolution of Liberty Mutual's motion for partial summary judgment turns on the interpretation of the pollution exclusion clauses contained in the policies issued by Liberty Mutual to Remington.

As the Court noted in its July 29, 1992 opinion in this case, the parties have stipulated that Connecticut law governs this dispute. *Remington Arms Co. v. Liberty Mutual Insurance Co.*, 796 F.Supp. 117, 118 (1992). Neither the parties nor the Court could discover any Connecticut case law concerning the proper construction to be given pollution exclusion clauses. Thus, Liberty Mutual's motion presents an issue of first impression under Connecticut law.

Confronted with this complete absence of any authority in Connecticut on this issue, the Court met with counsel on August 12, 1992, and directed their attention to the recent decisions of the United States Court of Appeals for the Third Circuit in the *New Castle County v. Hartford Accident And Indemnity Co.* litigation, *New Castle VII*, 970 F.2d 1267 (3d Cir.1992) and *New Castle V*, 933 F.2d 1162 (3d Cir.1991). In the *New Castle* litigation, the issue before the Third Circuit concerned the interpretation of a pollution exclusion clause identical to the one at issue in the present case in all

material respects. Delaware law governed the controversy and, as in the present case, the issue before the Third Circuit was one of first impression because no Delaware law on point could be found. Mindful that the *New Castle* decisions involved an application of Delaware law and therefore represented only highly persuasive authority, the Court instructed the parties to discuss the impact of the *New Castle* decisions on the present case in their briefs supporting and opposing Liberty Mutual's motion for partial summary judgment. Before addressing the merits of Liberty Mutual's motion for partial summary judgment, the Court must determine whether the Supreme Court of Connecticut would follow the construction of the pollution exclusion clause employed by the Third Circuit in the *New Castle* litigation. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### A. PREDICTING HOW CONNECTI-CUT'S HIGHEST COURT WOULD CONSTRUE THE POLLUTION EXCLUSION CLAUSE

When, in a diversity case, the district court is confronted with a complete absence of any law on the issue presented in the state whose law governs, the district court must predict how the highest court of that state would decide the issue. *Gruber v. Owens–Illinois Inc.*, 899 F.2d 1366, 1369 (3d Cir.1990). In making this prediction, the district court must consider all available data including analogous decisions of the state courts, restatements of the law, law review commentaries, and decisions from other jurisdictions. *Id.* quoting *Grantham and Mann, Inc. v. American Safety Products, Inc.*, 831 F.2d 596, 608 (6th Cir.1987). A leading treatise on federal practice has described the task of the district court thusly:

> When there is no persuasive state ruling on the question, the federal court must exercise its judgment based upon whatever principles of state law are applicable, or by recourse to the general rules of law applied according to its own best judgment, examining the decisions in other jurisdictions, the principles of the com-

mon law, other federal decisions, the American Law Institute's Restatement of the Law, and scholarly treatments of the law, including law review articles.

J. Moore, *et al.*, *1A Moore's Federal Practice* ¶ 0.308[2] at 3088–3090 (2d ed. 1991 & 1991–92 Cumulative Supp.).

The pollution exclusion clause contained in the Liberty Mutual policy which the Court is called upon to construe under the laws of Connecticut excludes coverage of claims for:

> [B]odily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

(D.I. 267.) This pollution exclusion clause contained in the Liberty Mutual policy mirrors the pollution exclusion clause utilized by virtually all insurance carriers in the industry. The clause was created by the insurance industry in an effort to limit insurance coverage of pollution related losses. Since its introduction into the insurance industry's standard general comprehensive liability policy in 1970, the pollution exclusion clause has generated an explosion of litigation. Note, *The Pollution Exclusion Clause Through The Looking Glass*, 74 Geo.L.J. 1237, 1251 (1986). The text of the exclusion forecloses coverage for damage resulting from the "discharge" of "contaminants". However, the clause contains an exception to the general rule of exclusion. Where the "discharge" of "contaminants" is "sudden and accidental", coverage is not foreclosed by the exclusion. In the present case, the pollution exclusion clause appears in every comprehensive general liability policy and excess policy that Remington purchased from Liberty Mutual from 1971 to 1980. Liberty Mutual contends that the claims at issue fall within the ambit of the pollution exclusion. By contrast, Remington contends that the

claims at issue are encompassed by the exception for "sudden and accidental" discharges and therefore, Remington argues that the exception supplies the basis for its breach of contract claim against Liberty Mutual.

### 1. Canons of Insurance Policy Interpretation Under Connecticut Law

Under Connecticut law, there are three canons of insurance policy interpretation which must be borne in mind when predicting how the Connecticut Supreme Court would construe the pollution exclusion clause at issue. *Firestine v. Poverman,* 388 F.Supp. 948, 951 (D.Conn.1975) (applying Connecticut law). The first of these canons is that:

> Where an insurer sets up a special exclusion for the purpose of withdrawing from the coverage a specific liability it was unwilling to provide indemnity for, the burden is on the insurer to prove that exception.

*Id. quoting American Insurance Co. v. Saulnier,* 242 F.Supp. 257, 259 (D.Conn. 1965); *see also O'Brien v. John Hancock Mutual Life Insurance Co.,* 143 Conn. 25, 119 A.2d 329 (1955).

The second canon is that insurance policies are to be construed in accordance with ordinary parlance. Thus, the language of the policy "must be accorded its natural and ordinary meaning and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." *Hammer v. Lumberman's Mutual Casualty Company,* 214 Conn. 573, 573 A.2d 699, 704 (1990); *see also Firestine,* 388 F.Supp. at 951. However, when the policy is ambiguous, "such ambiguity is, in accordance with standard rules of construction, resolved against the insurance company." *Schultz v. Hartford Fire Insurance Co.,* 213 Conn. 696, 569 A.2d 1131, 1135 (1990); *see also Firestine,* 388 F.Supp. at 951. This rule is derived from the doctrine of *contra proferentem* which is utilized by courts in interpreting adhesion contracts, of which insurance policies are a variety. Under the doctrine of *contra proferentem,* ambiguities in adhesion contracts are construed against the drafter.

■ The third canon is that an insurance policy "must be construed as a whole, and all of its relevant provisions are to be considered in connection with one another." *Firestine,* 388 F.Supp. at 951; *see also General Construction Co. v. Aetna Casualty & Surety Co.,* 151 Conn. 684, 202 A.2d 146 (1964). Furthermore, "[e]very provision [of an insurance policy] is to be given effect, if possible, and no word or clause eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be given to it." *Hammer,* 573 A.2d at 709 *quoting Schultz,* 569 A.2d at 1136. Accordingly, the proper interpretation of the exclusion clause at issue must not focus upon the pollution exclusion clause in isolation, but must focus upon the pollution exclusion in light of the other provisions contained in the comprehensive general liability policies and excess policies giving effect, if possible, to every word contained therein. With these canons of insurance policy interpretation of Connecticut law, the Court must predict how the Connecticut Supreme Court would interpret the Liberty Mutual policy at issue.

However, the Court's task is greatly facilitated by the opinions of the Third Circuit in *New Castle V,* 933 F.2d 1162 (3d Cir. 1991), and *New Castle VII,* 970 F.2d 1267 (3d Cir.1992). In these cases the Third Circuit was called upon to determine how the Delaware Supreme Court would construe the exception for sudden and accidental discharges contained in a pollution exclusion clause identical to the clause at issue in the present case. Central to the Third Circuit's analysis in *New Castle V,* were these canons of insurance policy interpretation which the Delaware courts had adopted. *New Castle V,* 933 F.2d at 1182.

Applying these canons of interpretation, the Third Circuit determined that the exception for "sudden and accidental" discharges was ambiguous. The Third Circuit reasoned that this ambiguity was created

by the use of the term "sudden" which was reasonably capable of two widely different interpretations; the Court found that lexicographers and jurists have disagreed and continue to disagree over whether the term "sudden" means "instantaneous" and thus contains a temporal dimension, or, whether the term "sudden" means "unexpected" and thus contains no temporal dimension. *Id.* at 1192–98.

Relying upon the doctrine of *contra proferentem,* the Third Circuit concluded that the ambiguity over the meaning of the term "sudden" must be resolved in favor of the insured. *Id.* at 1198–99. Thus, the Third Circuit construed the term "sudden" in conformity with the interpretation advanced by the insured, namely, that the term "sudden" means "unexpected," and therefore does not possess a temporal element. *Id.* Under this interpretation of "sudden", coverage would not be barred for discharges merely because those discharges occurred over an extended period of time. In order to avoid rendering the term "accidental" mere surplusage by virtue of the Court's interpretation of the word "sudden" as meaning "unexpected," the Third Circuit further held that the term accidental meant "unintended." *Id.*

In summary, the Third Circuit in *New Castle V* interpreted the exception for "sudden and accidental" discharges in the pollution exclusion clause as an exception for "unexpected and unintended" discharges. Under this interpretation, damages resulting from the unexpected and unintended discharge of contaminants were not excluded from coverage under the pollution exclusion clause.

In *New Castle VII,* the Third Circuit further refined its interpretation of the pollution exclusion clause. Specifically, the Court was called upon to construe the term "contaminants" in the pollution exclusion clause. The insured argued that the term "contaminants" contained a scienter element. Under the insured's construction of the term "contaminants," coverage is removed only if the insured possessed knowledge at the time of the discharge that the substances discharged were contaminants. The interpretation advanced by the insured in *New Castle VII* is more commonly referred to as the "known contaminant theory." The Third Circuit, again applying Delaware law in the absence of any Delaware case law or statutory law on this specific issue, rejected the insured's scienter argument. The Court held that "[t]he 'known contaminant theory' is simply wrong. The insurance policy nowhere hints that the term 'contaminants' carries with it a scienter element." *New Castle VII,* 970 F.2d at 1271. Therefore, under the Third Circuit's construction of the pollution exclusion, all that is required for coverage to be removed is that there be a discharge of a substance regardless of whether the insured had knowledge that the substance discharged was a contaminant. *Id.* at 1269.

 In view of the extensive analysis made by the Third Circuit in *New Castle V* and *New Castle VII* and the complete absence of any Connecticut case law on this issue, the Court holds that the Connecticut Supreme Court would adopt the interpretation of the pollution exclusion clause made by the Third Circuit in its decisions in *New Castle V* and *New Castle VII.*[1] Although in both *New Castle V* and *New Castle VII,* the Third Circuit applied Delaware's rules for the interpretation of insurance policies,

---

1. The Court notes that the present case is sufficiently distinguishable from *Northern Insurance Company of New York v. Aardvark Associates, Inc.,* 942 F.2d 189 (3d Cir.1991), in which the Third Circuit declined to follow its earlier interpretation of the pollution exclusion in *New Castle V.* In *Aardvark Associates,* the Third Circuit was confronted with the issue of how to interpret the pollution exclusion clause's exception for "sudden and accidental" discharges under Pennsylvania law in the absence of any pronouncement on that issue by the Pennsylvania Supreme Court. The Third Circuit declined to follow its prior interpretation of the exception in *New Castle V* because a significant number of decisions in the Superior Court of Pennsylvania had departed from that interpretation and had held "that the exception for 'sudden and accidental' discharges applies only to discharges that are abrupt and last a short time." *Aardvark Associates,* 942 F.2d at 193. In the present case, by contrast, neither the Court nor the parties have been able to locate any Connecticut case law on this issue. Thus, unlike the Third Circuit in *Aardvark Associates,* this Court is writing on a *tabula rasa.*

see *New Castle V,* 933 F.2d at 1182–83, 1192–98; *New Castle VII,* 970 F.2d at 1270–73, Delaware's rules for the interpretation of insurance contracts mirror those which the Connecticut courts have adopted. *See supra* text pp. 1409–1410. Furthermore, in *New Castle V,* the Third Circuit made an exhaustive survey of case law from other jurisdictions interpreting the pollution exclusion clause and concluded that there is "no noticeable trend nor a majority position. Rather, the authority appears to be evenly divided between the parties' competing constructions of the pollution exclusion clause, with about half of the cases holding that the clause bars coverage, and with the other half holding that it does not." *New Castle V,* 933 F.2d at 1195. Because of the identity of Delaware law and Connecticut law on the interpretation of insurance contracts generally, the exhaustive analysis of the Third Circuit in *New Castle V* and *New Castle VII,* and the lack of a majority position on the construction of the pollution exclusion, the Court holds that the Connecticut Supreme Court would adopt the construction of the pollution exclusion clause made by the Third Circuit in *New Castle V* and *New Castle VII.* Accordingly, the Court concludes that under Connecticut law, the terms "sudden and accidental" are interpreted to mean "unexpected and unintended". The Court further concludes that Connecticut would reject the "known contaminant theory" and therefore under Connecticut law the term "contaminants" does not possess a scienter element.

In summary, for the pollution exclusion to remove coverage under Connecticut law there must be a deliberate discharge of a substance. Whether the insured had knowledge that the substance discharged was a contaminant is irrelevant. Under Connecticut law, the exception for "sudden and accidental" discharges, is construed to extend coverage for "unexpected and unintended" discharges. Accordingly, coverage is not removed under the pollution exclusion clause where the discharge is both unexpected and unintended. With this construction of the pollution exclusion, the Court will consider defendant Liberty

Mutual's motion for partial summary judgment.

## II. SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for summary judgment. It provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When the movant is seeking summary judgment based on a defense as to which the movant bears the ultimate burden of proof at trial, as in the present case, the movant must establish every element of that defense as a matter of law. In other words, the movant must establish by evidence the absence of any genuine issue of material fact as to every element of the defense such that no reasonable jury could return a verdict for the nonmovant. However, any doubt as to the existence of a genuine issue of material fact must be resolved by the Court against the movant. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *J.F. Freeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3d Cir.1990); *see also* 10A C. Wright, *et al., Federal Practice and Procedure § 2727* (1983).

If the movant satisfies this onerous burden, the burden shifts to the nonmovant to proffer evidence sufficient to create a genuine issue of material fact at trial. When the nonmovant does not bear the burden of proof on the issue for which summary judgment is sought, as in the present case, the nonmovant may withstand summary judgment by proffering evidence sufficient to create a genuine issue of material fact as to any element essential to the movant's case. Rule 56(c) provides that "[w]hen a motion for summary judgment is made and supported [by evidence] ... an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading,

but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R.Civ.P. 56(c); *see also* Advisory Committee Notes to the 1963 Amendment of Rule 56, reported in 31 F.R.D. 648 (1963).

Therefore, the nonmovant may withstand summary judgment only by the proffer of evidence which demonstrates the existence of a genuine issue of material fact. An issue of material fact is genuine only "if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

■■■ Because Liberty Mutual seeks summary judgment on the grounds that insurance coverage for the claims at issue is foreclosed by the pollution exclusion clause contained in the insurance policies it sold to Remington, a defense which Liberty Mutual bears the ultimate burden of proof at trial under Connecticut law, *see supra* text p. 1410, Liberty Mutual bears the burden of coming forward with evidence sufficient to establish every element of its defense as a matter of law. Furthermore, Liberty Mutual must also bear the burden of establishing that the discharges of contaminants at issue do not come within the exception to the pollution exclusion clause for unexpected and unintended discharges.[2] Liberty Mutual can satisfy this burden by producing evidence which establishes as a matter of law that the discharges at issue were either expected or intended. Such evidence would establish that the discharges were not both unexpected and unintended and thus are beyond the scope of the insurance coverage.

## III. DISCUSSION

### A. REMINGTON PARK

Remington Park is a 435–acre tract of land in Bridgeport, Connecticut, owned by Remington. Final Consent Agreement Between EPA and Remington Arms (hereinafter referred to as "Final Consent Agreement"), D.I. 369, pp. A–177 to A–263, at p. A–182. From 1905 to December 15, 1989, Remington Park was the site of a substantial portion of Remington's munitions manufacturing operations. Phase I Resource Conservation And Recovery Report Prepared By BCM Engineers (May 1990), (hereinafter referred to as "Phase I Report"), D.I. 369, pp. A–264 to A–347, at p. A–271. By letter dated August 16, 1988, the United States Environmental Protection Agency notified Remington that it was subject to liability under the Resource Conservation And Recovery Act, ("RCRA"), 42 U.S.C. § 6901 *et seq.*, with respect to Remington's operations at Remington Park. D.I. 370 at p. A–350. Along with the let-

---

**2.** The Court is mindful that there is a division of authority throughout the nation on the issue of whether the insured or the insurer has the burden of proving an exception to an exclusion. *Northern Insurance Company of New York v. Aardvark Associates, Inc.*, 942 F.2d at 194–95 (3d Cir.1991); *see* 19 G. Couch, *Couch Cyclopedia On Insurance Law 2d* § 79:385 at p. 338 (M. Rhodes rev. ed. 1983); *see also* B. Ostrager & T. Newman, *Handbook On Insurance Coverage Disputes* § 8.02[a] at p. 255 (4th ed. 1991). However, allocating the burden of proving the inapplicability of an exception to an exclusion to the insurer is consistent with Connecticut law on the interpretation of insurance policies generally. Under Connecticut law, the burden of proving an exclusion falls upon the insurer because an exclusion removes the right to coverage, which is already vested in the insured under the policy. *Young v. America Fidelity Insurance Co.*, 2 Conn.App. 282, 479 A.2d 244, 246–47 (1984). However, the burden of proving the satisfaction of a condition precedent in an insurance policy under Connecticut law falls upon the insured because "[a] condition precedent.... is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed." *Id.* 479 A.2d at 246. An exception to an exclusion is merely part of the exclusion and does not warrant a shifting of the burden of proof to the insured. Furthermore, an exception to an exclusion is not tantamount to a condition precedent because the insured has already established that its conduct comes within the ambit of the policy and therefore, its right to coverage has accrued. Furthermore, the Court finds it highly persuasive that this allocation of proof was endorsed by the Third Circuit in its opinion in *New Castle V*, 933 F.2d at 1181–82.

ter, the EPA sent Remington a draft consent agreement which imposed upon Remington various reporting, monitoring, and investigative requirements and also required Remington to take certain corrective response measures to abate the environmental contamination at Remington Park. Draft Consent Agreement Between EPA and Remington Arms (hereinafter referred to as "Draft Consent Agreement"), D.I. 370, pp. A–351 to A–380. The letter explained that if Remington and EPA failed to enter into a final consent agreement, EPA would resort to its other statutorily defined enforcement powers enumerated in 42 U.S.C. § 6928(h) "to ensure that the necessary response measures [were] carried out." D.I. 370, at p. A–350.

The draft consent agreement identified 59 solid waste management units ("SWMUs") at Remington Park. As defined in the draft consent agreement, an SWMU is:

> [A]ny unit at a facility from which hazardous waste or hazardous constituents might migrate, irrespective of whether the unit was intended for the management of solid and/or hazardous wastes. A solid waste management unit may include areas at facilities which have become contaminated as a result of routine or systematic releases of hazardous waste or hazardous constituents.

Draft Consent Agreement, *supra*, D.I. 370 at p. A–355. The draft further categorized the SWMUs according to type:

> Forty-one of the SWMUs are or were either landfills and/or lagoon impoundments, four are or were used as waste storage areas, four are or were used as landfill range target areas, four are or were used as explosive detonation or burning disposal areas, five are tank areas, and one is a RCRA surface impoundment associated with wastewater treatment operations since 1975.

*Id.* at A–358.

After negotiations with Remington, the EPA subsequently revised its claims

against Remington and on August 1990, a Final Consent Agreement was executed. This Final Consent Agreement was limited to twenty-two areas of environmental concern ("AECs"). As defined by the Final Consent Agreement, AECs are areas "at which hazardous waste or hazardous constituents may have been managed or come to be located and from which releases of hazardous waste or hazardous constituents have occurred." Final Consent Agreement, *supra*, D.I. 369 at p. A–204. According to Remington, it has already spent $2.2 million in complying with the Final Consent Agreement and expects to incur additional expenses in compliance through 1994. In this action, however, Remington seeks insurance coverage for expenses associated with respect to eight of the twenty-two AECs.[3] Answering Brief of Plaintiff Remington In Opposition to Defendant Liberty Mutual's Motion For Partial Summary Judgment Relating To The Pollution Exclusion, (hereinafter referred to as "Answering Brief"), D.I. 374 at p. 4.

In support of its motion for summary judgment with respect to Remington's claims for coverage from 1971 to 1980 at Remington Park, Liberty Mutual argues that Remington's claims are barred as a matter of law by the pollution exclusion clause. Brief In Support Of Defendant Liberty Mutual Insurance Company's Supplemental Motion For Partial Summary Judgment Relating To The Pollution Exclusion (hereinafter referred to as "Opening Brief"), D.I. 365 at 9–14; Defendant Liberty Mutual Insurance Company's Reply Brief In Support Of Its Supplemental Motion For Partial Summary Judgment Relating To The Pollution Exclusion (hereinafter referred to as "Reply Brief"), D.I. 403 at 4–12. Remington argues that summary judgment is inappropriate because a genuine issue of material fact exists as to: (1) whether Liberty Mutual breached its duty to defend Remington in the administrative action brought by EPA for the contamination of Remington Park;[4] and (2) whether

---

**3.** Specifically, Remington seeks coverage for AECs 1, 2, 6, 7, 8, 9–1 to 9–5, 12, 19.

**4.** It should be noted that Remington does *not* assert a claim for breach of the duty to defend

the discharges at Remington Park come within the ambit of the exception to the pollution exclusion clause for unexpected and unintended discharges. Remington's Answering Brief In Opposition To Defendant's Motion For Partial Summary Judgment Relating To The Pollution Exclusion (hereinafter referred to as "Answering Brief"), D.I. 374 at 9–13 and 29–35.

For the reasons stated more fully below, the Court concludes that a genuine issue of material fact exists as to whether Liberty Mutual breached its duty to defend Remington in the EPA administrative action pertaining to the Remington Park contamination. Therefore, Liberty Mutual has not satisfied its burden of proving as a matter of law that the pollution exclusion clause removes coverage for Remington's claims for damages at Remington Park under the 1971 to 1980 policies. Accordingly, Liberty Mutual's motion for summary judgment will be denied with respect to Remington's claims for damages at Remington Park under the 1971 to 1980 policies. Furthermore, in the interests of judicial economy the Court finds it unnecessary to consider Remington's argument that the discharges at Remington Park are covered under the exception for unexpected and unintended discharges at this juncture.

1. *A Genuine Issue of Material Fact Exists as to Whether Liberty Mutual Breached its Duty to Defend Remington in EPA Action With Respect to the Contamination at Remington Park*

■ Under Connecticut law, the duty to defend is independent of and broader than the duty to indemnify. *Keithan v. Massachusetts Bonding And Insurance Company,* 159 Conn. 128, 267 A.2d 660, 665–66 (1970). "The general rule is '[i]f an allegation of the complaint falls even *possibly* within the coverage, then the insurance company must defend the insured.' " *City of West Haven v. Commercial Union Insurance Company,* 894 F.2d 540, 544 (2d Cir.1990) (applying Connecticut law) (emphasis in original) *quoting City of West Haven v. Liberty Mutual Insurance Co.,*

639 F.Supp. 1012, 1017 (D.Conn.1986); *see also Keithan v. Massachusetts Bonding & Insurance Co.,* 267 A.2d at 665–66; *Missionaries of the Company of Mary, Inc. v. Aetna Casualty & Surety Co.,* 155 Conn. 104, 230 A.2d 21 (1967); *Firestine v. Poverman,* 388 F.Supp. at 950; *Krevolin v. Dimmick,* 39 Conn.Supp. 44, 467 A.2d 948 (1983). "Interpreting this rule, the Connecticut courts have required the insurer to defend even when the allegations against the insured, as pleaded, were 'groundless' ... and even when requiring a defense would seem to eviscerate the clear, plain intent of a clause excluding coverage." *National Fire And Marine Insurance Company v. Picazio,* 583 F.Supp. 624, 628 (D.Conn.1984) (applying Connecticut law) (citations omitted). "Where an insurer is guilty of a breach of its contract to defend, it is liable to pay to the insured not only his reasonable expenses in conducting his own defense but, in the absence of fraud or collusion, the amount of a judgment obtained against the insured up to the limit of liability fixed by its policy." *Keithan,* 267 A.2d at 666.

■ To determine whether the insurer has breached its duty to defend under Connecticut law, the reviewing Court must examine the claims brought against the insured. If on their face, the claims appear to come within the ambit of the insurance policy, the insurer has a duty to defend; "and it is irrelevant that the insurer may get information from the insured, or from anyone else, which indicates, or even demonstrates, that the injury is not in fact 'covered.' " *Id.; see Schurgast v. Schumann,* 156 Conn. 471, 242 A.2d 695, 704 (1968) ("The determination of the question [of] whether ... [the insurer] had a duty to defend ... depends on whether the complaint in that action stated facts which appear to bring ... the claim of damage within the policy coverage."); *Missionaries of the Company of Mary, Inc.,* 230 A.2d at 25 ("[T]he duty to defend does not depend on facts disclosed by the insurer's independent investigation where the third party's complaint appears to be within the cover-

against Liberty Mutual with respect to the Bar-

num Avenue and Lordship Point sites.

age."); *Firestine,* 388 F.Supp. at 950 ("It is irrelevant to the existence of a duty to defend whether or not the complaint is groundless and whether or not the insurer will eventually be able to establish that it has no duty to indemnify the insured.").

 Applying these blackletter rules of Connecticut law to Remington's claims for coverage with respect to Remington Park, the Court concludes that a triable issue of fact exists as to whether Liberty Mutual breached its duty to defend. By letter dated August 16, 1988, EPA informed Remington that it was subject to liability under RCRA. Accompanying the letter, EPA sent a draft consent agreement setting forth with particularity the nature of the claims against Remington. Draft Consent Agreement, *supra,* D.I. 370, pp. A–351 to A–380. Remington has come forward with evidence demonstrating that it sent copies of the EPA letter and draft consent agreement to Liberty Mutual and requested Liberty Mutual to defend Remington under the policies at issue. John Faughnan, a Vice President of Marsh & McLennan, Remington's insurance broker, testified in his affidavit that he forwarded a copy of the EPA letter and draft consent agreement to Liberty Mutual along with a letter dated September 22, 1988, in which he requested that Liberty Mutual defend the EPA action. Affidavit of John J. Faughnan, D.I. 375, at p. R277. Faughnan also testified that he received no response from Liberty Mutual and on or about January 5, 1989, he again dispatched a copy of the EPA letter and draft consent agreement, and a letter requesting a defense. *Id.* Faughnan also produced a copy of the signed U.S. Postal Service Certified Mail receipt dated January 9, 1989 as evidence that his dispatch was sent and received by Liberty Mutual. *Id.* at p. R286–87. There is additional evidence in the record which indicates that Remington made repeated attempts in March and June of 1989 to obtain a defense from Liberty Mutual. According to the testimony of Kathleen A. Raymond, a Senior Insurance Analyst with E.I. Du Pont de Nemours & Company ("Du

Pont")[5] from 1986 to 1990, Liberty Mutual did not respond to Remington's repeated requests for a defense until sometime after December 31, 1989, nearly four and a half months after Remington instituted the present suit to obtain insurance coverage. Affidavit of Kathleen A. Raymond, D.I. 375, at p. R296; *see also* Copy of Letter Dated December 13, 1989 from Stephen C. Brody, Environmental Claims Technical Specialist at Liberty Mutual to Remington Arms, D.I. 375 at pp. R321 to R324. Moreover, Faughnan testified that Liberty Mutual was sent a federal express package on May 2, 1990, containing a copy of the Final Consent Agreement and a letter requesting that Liberty Mutual respond and provide a defense. Affidavit of John J. Faughnan, D.I. 375, at p. R278–79; *see also* Copy of Letter Dated May 2, 1990 from John F. Faughnan to Liberty Mutual Casualty Claims Department. Faughnan testified that Liberty Mutual did not respond to his final entreaty. Affidavit of John J. Faughnan, D.I. 375, at p. R279. Thus, there is evidence in the record that Liberty Mutual did not defend Remington in the EPA action.

Consideration of the underlying EPA draft consent agreement indicates that a genuine issue of material fact exists as to whether the claims therein possibly fall within the scope of coverage and thus trigger the duty to defend. For although the draft consent agreement does contain innumerable references to releases of "hazardous wastes" at Remington Park, as Liberty Mutual correctly points out, the draft consent agreement does not specify how these releases occurred, when they occurred, and whether or not they were unexpected and unintended. Draft Consent Agreement, *supra,* at pp. A–356 to A–371. Therefore, with respect to the 1971 to 1980 policies, it is not clear that these claims fall within the pollution exclusion or the exception for unexpected and unintended discharges. Furthermore, certain of the claims brought by the EPA against Remington concerned pollution damage which occurred before 1971. These claims are covered under the pre-1971 insurance policies which Liberty Mu-

---

5. Remington Arms is a wholly owned subsidiary of Du Pont.

tual issued to Remington. It is undisputed that these pre–1971 policies do not contain a pollution exclusion clause. Accordingly, there is a genuine issue of material fact as to whether on their face EPA's claims against Remington possibly fall within the scope of coverage, and thus triggered Liberty Mutual's duty to defend. Therefore, it would be inappropriate to grant Liberty Mutual's motion for summary judgment as to Remington's 1971 to 1980 claims for damages at Remington Park.

It should be noted that the Court does not express any opinion as to the merits of Remington's claim that Liberty Mutual breached its duty to defend. The Court merely holds that Remington's claim has created a genuine issue of material fact sufficient to withstand Liberty Mutual's motion for summary judgment.

## B. BARNUM AVENUE

■ Remington's Barnum Avenue complex is located approximately 2 miles south of Remington Park on the east side of the City of Bridgeport. The facility began operations in 1866 and, until it was sold in June 1986, was the center for Remington's munitions manufacturing operation. To the east, the Barnum Avenue complex is bordered by a stream network called "Pembroke Lake". Pembroke Lake is divided into three areas, Upper, Middle, and Lower Pembroke Lake. *See* List Of Buildings Of Remington Arms Company, Inc. At Bridgeport Works, (hereinafter referred to as "Buildings List"), D.I. 370 at p. A–475; Preliminary Assessment Report Of Remington Arms Company, Inc., Bridgeport, Connecticut, Prepared By The United States Environmental Protection Agency (January 6, 1986), (hereinafter referred to as "EPA Preliminary Assessment Report"), D.I. 370 pp. A–453 to A–463, at p. A–453; Preliminary Engineering report Of Acqueous Waste Treatment Facilities At The Remington Arms Company, Inc. Plants In Bridgeport, Connecticut, (hereinafter referred to as "Preliminary Engineering Report") D.I. 370 pp. A–464 to A–471, at p. A–464.

On February 9, 1988, the Commissioner of the Connecticut Department of Environmental Protection issued an order requiring Remington to investigate and determine the extent of the sediment and surface water contamination at Pembroke Lake. Order To Remington Arms Co., Inc., To Abate Pollution, Issued By State Of Connecticut Department Of Environmental Protection, February 9, 1988, (hereinafter referred to as "Pembroke Lakes Pollution Order"), D.I. 375 at pp. R92–93. The order further required Remington to engage a professional environmental engineering consultant to perform the investigation and to submit a final report to the Commissioner by July 29, 1988. *Id.* at p. R92. In compliance with this order, Remington engaged the environmental consulting firm of Lawler, Matusky & Skelly Engineers ("LMS") to perform the mandated investigation and submit the final report. LMS eventually submitted its final report on January 19, 1989. Final Report On Sediment & Surface Water Contamination At Pembroke Lakes Prepared By Lawler, Matusky & Skelly Engineers January 19, 1989, (hereinafter referred to as "LMS Final report"), D.I. 370, pp. A–623 to A–693. The LMS Final Report concludes that "[t]he degree of contamination [in Pembroke Lakes] is greatest for mercury and lead out of all the pollutants analyzed. Elevated mercury and lead concentrations in shallow sediments (up to 3 ft. depth) extend throughout Upper, Middle, and Lower Pembroke Lakes." *Id.* at p. A–633.

Neither party disputes the findings of the LMS Final Report. Instead, the parties contest the source of the pollution at Pembroke Lake. Liberty Mutual contends that the contamination was the result of discharges from three facilities at the Barnum Avenue complex. According to Liberty Mutual, two of these facilities, the "rim fire ammunition and center fire bullet manufacturing" facility and the "tracer cake mixing" facility, discharged lead contaminated effluent directly into Pembroke Lake. Opening Brief, *supra*, D.I. 365 at 15–16. As evidence of Remington's deliberate and repeated practice of discharging lead contaminated effluent from these two

facilities, Liberty Mutual offers the 1971 application which Remington sent to the Army Corps of Engineers in order to obtain a permit for the 27 points of effluent discharge at Remington Park and Barnum Avenue. 1971 Permit Application, D.I. 370 at pp. A–484 to A–592. The application indicates that the effluent discharged by Remington from these two facilities contained significant amounts of lead. *Id.* at p. A–557 and p. A–560. The third facility from which discharges into Pembroke Lake emanated, according to Liberty Mutual, is the Barnum Avenue Burning Plant. Opening Brief, *supra*, D.I. 365 at 16. The Burning Plant, also referred to as Building 872, was the location of Remington's lead collection and recycling operations.

Remington concedes that the discharges from both the "rim fire ammunition and center fire bullet manufacturing" facility and the "tracer cake mixing" facility were expected and intended and therefore beyond the scope of coverage under the pollution exclusion clause. However, Remington argues that the principal source of the contamination in Pembroke Lake was the Barnum Avenue Burning Plant. Answering Brief, D.I. 374 at 19. Remington contends that the discharges from the Burning Plant were unexpected and unintended because "[t]here were … no pipes, trenches or drains linking the [B]urning [P]lant and the Lakes." [6] *Id.* Thus, Remington argues that even if the effluent discharges from the "rim fire ammunition and center fire bullet manufacturing" facility and the "tracer cake mixing" facility contributed in some degree to the contamination of Pembroke Lake, that does not prevent Remington from receiving coverage for the property damage that was due to the unexpected and unintended discharges from the Burning Plant. *Id.* at 21.

In support of its contention that the contamination in Pembroke Lake was primari-

ly the result of unexpected and unintended discharges from the Burning Plant, Remington relies upon the affidavit testimony of Rodney S. Toulson, a Remington employee and formerly the foreman at the Burning Plant, and the affidavit testimony of Dr. Thomas L. Englert, an environmental engineering consultant with LMS. In his affidavit, Toulson testified as to the operations at the Burning Plant and concluded that "[d]uring my supervision of the Burning Plant there was never any expectation or intent that there would be any discharges from the Burning Plant into Upper Pembroke Lakes [sic]." Affidavit of Rodney S. Toulson, D.I. 375 at p. R261. Dr. Thomas L. Englert testified that "it is my opinion to a reasonable scientific certainty that the Burning Plant operations from 1957 to 1986 were a source of lead contamination of the sediment in Upper Pembroke Lake." Affidavit of Dr. Thomas L. Englert, D.I. 375 at p. R272.

Rodney S. Toulson's conclusion that the discharges at the Barnum Avenue Burning Plant were unexpected and unintended is belied by the other statements in his affidavit which reveal a deliberate, intentional, and routine practice of incinerating off-specification shells, cartridges, and primers in the Burning Plant furnaces. Toulson Affidavit, *supra*, at R260. These incineration operations constitute the discharges which the Court must consider under the unexpected and unintended standard. The evidence before the Court indicates that these incineration operations were deliberate, intentional, and routine, and were performed in the same manner from 1957 to 1980. *Id.* at R260–61. Therefore, the Court finds as a matter of law that the discharges in the Burning Plant were neither unexpected nor unintended.

■ Remington attempts to obfuscate the issue by asserting that it did not intend and did not expect the discharge of lead

---

**6.** At the oral argument on December 16, 1992, Remington informed the Court and Liberty Mutual that new evidence revealed the possibility that a sink drain and a water fountain drain may have emptied directly into Pembroke Lake. Remington argues that even assuming that these direct discharges occurred, these discharges

contained no contamination and consisted solely of water. This new evidence is immaterial to the Court's analysis of the present motion. This evidence may, however, have a bearing on the resolution of Remington's claim for coverage under the pre–1971 insurance policies. However, that issue is not before this Court.

from the Burning Plant. Answering Brief, *supra*, at 18–21. Remington's assertion is merely a variant of the known contaminant theory rejected in *New Castle VII* and rejected by the Court today under its interpretation of Connecticut law. All that is required to trigger the pollution exclusion is an intended or an expected act of discharge. Whether the insured intended or expected the contamination resulting therefrom is immaterial. *New Castle VII*, 970 F.2d at 1269, 1271–72. The record reveals that the incineration operations at the Burning Plant were neither unexpected nor unintended. Nowhere in its briefs submitted to this Court does Remington contend otherwise. Whether Remington expected or intended the resulting lead contamination is immaterial.

In summary, Liberty Mutual has sustained its burden of proof and established that the discharges at Barnum Avenue were not unexpected and unintended as a matter of law, and therefore, within the ambit of the pollution exclusion. Accordingly, Liberty Mutual's motion for summary judgment will be granted with respect to Remington's Barnum Avenue claims to the extent that those claims are for damages from 1971 to 1980. Because the Court finds that the evidence in the record manifests that all of the discharges at the Barnum Avenue site were neither unexpected nor unintended and thus excluded from coverage, the Court finds it unnecessary to apportion the damages at the Barnum Avenue site from 1971 to 1980 among discharges from the "rim fire ammunition and center fire bullet manufacturing" facility, the "tracer cake mixing" facility, and the Burning Plant.

## C. LORDSHIP POINT GUN CLUB

■ For over 60 years, Remington and its predecessors operated a trap and skeet shooting club on Lordship Point in Stratford, Connecticut. *See Connecticut Coastal Fishermen's Association v. Remington Arms Co., Inc.*, 777 F.Supp. 173, 175 (D.Conn.1991). Lordship Point is a small promonotory extending into the Long Island Sound where the Housatonic River enters the Sound. Maps of Site, D.I. 369 at p. A–349. The modus operandi at the Lordship Point Gun Club is not disputed by the parties. Clay targets were hurled into the air over the Sound. Stationed at various positions facing outward toward the Sound, riflemen fired their weapons at the targets. Consequently, lead shot, targets, and target fragments were discharged into the Long Island Sound in enormous quantities. Deposition of Amerigo Pagliaroli, D.I. 369 at p. A–144; *Connecticut Coastal Fishermen's Association*, 777 F.Supp. at 176. By Remington's own admission some 70 tons of lead shot per year were discharged into the Long Island Sound. Lordship Point Questions & Answers, D.I. 369 at p. A–154. In an action brought by the Connecticut Coastal Fishermen's Association against Remington for violations of RCRA and the Clean Water Act, 33 U.S.C. § 1365(a), the United States District Court for the District of Connecticut determined that Remington had deposited "[a]pproximately 4 million pounds of lead" and "approximately 11 million pounds of target" debris around Lordship Point. *Connecticut Coastal Fishermen's Association*, 777 F.Supp. at 176. On August 19, 1985, the Connecticut Department of Environmental Protection ordered Remington to perform a study of the effects of lead shot fired from the Gun Club on the sediments, aquatic life and water fowl of the Long Island Sound and to take remedial measures. *Id.*

Remington does not seek coverage for the lead shot and target debris contamination at Lordship Point under the exception to the pollution exclusion clause for unexpected and unintended discharges. Rather, Remington argues that the pollution exclusion clause does not apply to its skeet shooting operations at Lordship Point because skeet shooting is not pollution. Answering Brief, D.I. 374 at 22–28. Remington's contention is without merit.

In *Connecticut Coastal Fishermen's Association*, the District Court for the District of Connecticut held that lead shot and target debris constituted solid waste and were, therefore, subject to regulation under RCRA. 777 F.Supp. at 194. The Court also held that the lead shot constituted a hazardous solid waste under RCRA. *Id.* at

194-95. This Court will not disturb these findings of the District Court for the District of Connecticut and hereby incorporates them for the reasons stated in that Court's opinion. The pollution exclusion clause in the policies purchased by Remington forecloses coverage for damages "arising out of the discharge of.... waste materials...." Since the lead shot and target debris were found by the District Court for the District of Connecticut to constitute solid waste, the recovery for damages resulting therefrom is barred by the pollution exclusion. Accordingly, Remington's claims as to the Lordship Point Gun Club from 1971 to 1980 are barred as a matter of law by the pollution exclusion. Therefore, Liberty Mutual's motion for summary judgment as to Remington's claims for damages which occurred at Lordship Point between 1971 to 1980 will be granted.

## IV. CONCLUSION

For the reasons set forth above, Liberty Mutual's motion for partial summary judgment will be granted for Remington's claims for damages which occurred between 1971 and 1980 at the Barnum Avenue site and the Lordship Point Gun Club site. Liberty Mutual's motion for summary judgment will be denied as to Remington's claims for damages which occurred from 1971 to 1980 at Remington Park. An order consistent with this opinion shall be issued forthwith.