**INTEREX CORPORATION, Plaintiff,**

v.

**ATLANTIC MUTUAL INSURANCE COMPANY, Defendant.**

**Civ. A. No. 88–1380–REK.**

United States District Court, D. Massachusetts.

Jan. 18, 1995.

Final Judgment Feb. 2, 1995.

David M. Jones, Kirkpatrick & Lockhart, Boston, MA, for plaintiff.

Richard J. Riley, Murphy & Riley, Boston, MA, for defendant.

## OPINION

KEETON, District Judge.

This aging hazardous-waste-disposal-liability-insurance-coverage dispute, unique in some details, is in many ways within a familiar pattern of factual and legal complexity. In a commendable response to the practical consequences for the parties and the legal system, counsel cooperated fully with the court in fashioning an order for phased trial, commencing with a Phase–One Trial before a jury on the issues determining liability for coverage.

For the reasons explained in this Opinion, I conclude that defendant Atlantic Mutual Insurance Company ("Atlantic Mutual") is entitled to judgment on the verdict and, in the alternative, to judgment in part on the verdict and in part as a matter of law.

### I.

From the outset, the dispute has centered on the duty to pay and the duty to defend under an "occurrence" liability insurance policy that was issued by Atlantic Mutual to Interex Corporation, Inc. ("Interex") for a policy period of noon December 29, 1979 to noon December 29, 1980 (the 1979–80 period), renewed for a period of noon December 29, 1980 to noon December 29, 1981 (the 1980–81 period).

Three governmental agencies (of the United States, Massachusetts, and New Hampshire) issued PRP letters in 1986, asserting claims against Interex, among other entities, for remediation costs for toxic waste contamination at four Cannons Engineering sites, located respectively at Bridgewater and Plymouth, Massachusetts, and Nashua and Londonderry, New Hampshire.

### II.

Consultation on the verdict form and charge to the jury commenced months before the jury was impanelled and continued intermittently throughout the trial, ending (with

objections to the verdict form and charge, and rulings on them) just before the jury commenced deliberations.

The purpose of the court was, in cooperation with counsel, to fashion a verdict form that would, if possible, obtain an answer from the jury to every question of genuinely disputed fact that might be material to judgment under any resolution, by this or a higher court, of the many and complex disputed issues of law.

First-phase issues of fact were submitted to the jury by special questions only. That is, the court elected the option, allowed by Fed.R.Civ.P. 49(a), not to ask the jury to return a general verdict under Fed.R.Civ.P. 49(b).

The verdict was in the form of answers to nine special questions, subdivided into more than a hundred pairs of blanks labeled YES or NO and a few dozen three-way YES options for the jury to check, if applicable. The jury's answers have considerably reduced the number of factual and legal issues material to disposition.

Still left for decision, after substantial post-verdict submissions of the parties, is a moderately complex array of substantive and procedural issues.

The jury returned its verdict in the Phase–One Trial on July 22, 1994. The verdict is reproduced in Appendix A to this Opinion. Appendix B contains the introductory paragraphs of the Charge to the Jury along with Part II of the Charge, which explained to the jury the law relevant to the special questions directed to them.

Each party moved for judgment as a matter of law after the evidence was closed in the Phase–One Trial. The motions were "not granted," Fed.R.Civ.P. 50(b).

Each party moved for final judgment in its favor, partly on the verdict and partly as a matter of law. Each party moved, in the alternative, for an interlocutory judgment in its favor as to specified issues, partly on the verdict and partly as a matter of law, requesting that the court proceed promptly with a Phase–Two Trial of all remaining issues essential to final disposition.

I have reviewed the jury verdict and have determined that (with one possible exception, Answer 9(a), discussed in Part IX *infra*) all the jury findings were supported by evidence received at the Phase–One Trial. Indeed, the entire array of jury answers, considered in the context of the whole set of factual disputes presented by the evidence received at the Phase–One Trial, gives me confidence that the jury, despite the extraordinary complexity of the case, understood the evidence, the contrasting contentions of the parties, and the questions submitted to them. They answered in a pattern consistent with a reasoned determination of all the genuinely disputed fact questions they were asked to answer.

The way issues of law are decided in this or a higher court will determine which among all the findings are material to final judgment and which are not.

For the reasons stated in this Opinion, I conclude that defendant Atlantic Mutual is entitled to judgment on the verdict of the jury as to the liability issues tried in the Phase–One Trial. In addition, I have proceeded to examine other issues that might be reached if a higher court overturned one or more of my legal rulings material to judgment on the verdict. After doing so, I have determined, in the alternative, that under each of two additional lines of legal reasoning involving currently unsettled issues of state substantive law, Atlantic Mutual is entitled to judgment. On either of these alternative grounds, the judgment would be partly on the verdict and partly as a matter of law. Under all three bases of judgment, some of the jury findings (though supported by evidence and favorable to the position argued by plaintiff) are determined to be immaterial to the outcome as a matter of law.

### III.

The scope of coverage for either a duty to pay or a duty to defend under liability insurance coverage depends, first, on the terms of the contract.

There are significant differences among liability insurance contracts. For example, some are "occurrence" policies; others are "claims made" policies. Moreover, different

"occurrence" policies differ from each other in significant ways, and so do different claims-made policies.

The policies in evidence in this case are "occurrence" policies, which state that the insurer promises

> [to pay] on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of
>
> . . . . .
>
> ... **property damage** to which this insurance applies, caused by an **occurrence**
> ....

The policies also state that

> the company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such ... **property damage,** even if any of the allegations of the suit are groundless, false, or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient....

The following definitions are provided:

> **"occurrence"** means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured;** ...
>
> **"property damage"** means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, ...

The policy also contains a common form of "pollution exclusion" that states:

> This insurance does not apply:
>
> [to] property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental; ...

Other relevant policy provisions are quoted in full in the Charge to the Jury reproduced in Appendix B.

## IV.

As noted above, the answers of the jury to special questions are set forth in full in Appendix A. Here, I summarize key findings that, under my conclusions of law, support a judgment for defendant Atlantic Mutual on the verdict of the jury as to the liability issues in this case. The jury was asked to make findings as to all four Cannons sites, and to make findings for each of the two policy years at issue.

### A. The 1979–80 Policy Year

With respect to the Plymouth site, the jury found that the PRP letters made a claim against Interex that was or potentially (even if not explicitly) was based on property damage caused by a release of waste materials or other contaminants during the 1979–80 policy year. *See* Jury's Responses to Questions 2(a), (b), and (c); 4(a), (b), and (c). The jury found that the property damage did not arise out of a release that was sudden. *See* Jury's Response to Question 2(c)(ii). The jury found that there was no preponderance of evidence either way as to whether the PRP letters even potentially claimed that the property damage arose out of a release that was sudden. *See* Jury's Response to Question 4(c)(ii).

The jury found that the PRP letters did not claim or potentially claim that property damage arose out of a release during the 1979–80 policy year at any of the other three Cannons sites.

### B. The 1980–81 Policy Year

With respect to the Bridgewater site, the jury found that the PRP letters made a claim against Interex that was or potentially (even if not explicitly) was based on property damage caused by a release of waste materials or other contaminants during the 1980–81 policy year. *See* Jury's Responses to Questions 3(a), (b), and (c); 5(a), (b), and (c). The jury found that there was no preponderance of the evidence either way as to whether the property damage arose out of a release that was sudden and that there was no preponderance of the evidence either way as to

whether the PRP letters even potentially claimed that the property damage arose out of a release that was sudden. *See* Jury's Responses to Questions 3(c)(i) and 5(c)(i).

The jury found that the PRP letters did not claim or potentially claim that property damage arose out of a release during the 1980–81 policy year at any of the other three Cannons sites.

For reasons explained in Part VI below, I hold that the burden of proof was on Interex on the issue of suddenness, as part of the meaning of "sudden and accidental." The failure of Interex to meet this burden was fatal to all Interex claims for coverage.

## V.

### A.

Each party has advanced an argument after verdict for an interpretation of the verdict form that is both contrary to its commonsense meaning and contrary to any contention disclosed unambiguously to the court and opposing ·counsel and accepted by the court as a premise for fashioning the verdict form and the charge explaining it.

The consultations of record regarding the verdict form and charge to the jury were extensive. If counsel on either side thought the verdict form susceptible of the interpre·tation now suggested, they had ample opportunity to disclose that potential interpretation to opposing counsel and the court. Applying a standard of *objectively reasonable* conduct, I find that counsel on each side could not reasonably have believed that the court and opposing counsel would have agreed to either of the interpretations now advanced. This is especially apparent in view of the court's expressed objective of phrasing the questions, to the maximum extent possible given the complexity of the case, in plain English rather than jargon developed by lawyers practicing in the hazardous waste disposal/liability insurance area, and with successive questions organized and positioned on the page for the reader in a structure that would help the reader see the pattern of the verdict form as a whole, the similarities and differences among the different questions and sub-parts of ques-

tions, and the relationships among the questions and subparts of questions.

Atlantic Mutual now attempts to convert answers to part (c)(ii) of Questions 2 and 4 and part (c)(i) of Questions 3 and 5 into jury findings of no accident. Interex argues that the answers to part (a) of Questions 2 through 5 alone are sufficient to satisfy the elements of its burden of proving a claim or potential claim within the primary definition of coverage in the insurance contract. Interex then argues that answers to parts (b) and (c) of Questions 2 through 5 are merely jury findings that the pollution-exclusion clause of the policy did not apply. Thus, Interex concludes that the jury found that there were covered occurrences not involving any release or discharge of contaminants into or onto one of the Cannons sites, i.e., occurrences within the primary definition of covered occurrences and entirely outside the pollution exclusion.

The arguments of both parties are fundamentally inconsistent with a commonsense interpretation of the questions in the verdict form and answers of the jury. Before turning to that interpretation in Part D below, I call attention to some of the flaws in each of the opposing contentions for a different interpretation.

### B.

Atlantic Mutual contends that it is fatal to all Interex claims that the jury declined to find by a preponderance of the evidence in part (c) of Questions 2 through 5 that a discharge or release, at a site where they found that one occurred, was accidental from the standpoint of the person causing the discharge.

I rejected this contention during consultations on the charge and verdict form because it is not supported by any precedent directly on point, interpreting a policy containing the definitions of "occurrence" and "property damage" that appear in the contract between Atlantic Mutual and Interex. Though the issue may be unsettled and debatable under existing precedents, I do not reach it in deciding this case in view of my conclusion

that judgment must be entered for Atlantic Mutual in any event on other grounds.

### C.

■ Interex contends that the phrase "this kind of property damage," in part (c) of Questions 2 through 5, referred not to whatever property damage the jury had found in answering part (a) but only to "property damage 'arising out of' the discharge of waste material into or upon land, air or water." Pl.Mem. (Docket No. 231) p. 7. This flawed assumption about the antecedent of "this kind" is part of a syllogism in which Interex argues that we should assume that in answering part (a) of each of Questions 2 through 5 the jury found—but, rather curiously, only as to sites with respect to which the jury answered NO in part (c)—property damage other than "the property damage" about which they made findings in part (c).

In the first place, construing the verdict form in this way makes it a deeply-flawed method of attempting to obtain from the jury the needed answers to decide the outcome of this case. Plaintiff made no such suggestion as this either in requests for instruction or in objections to the charge.

In general, post-verdict ingenuity of counsel in trying to convert adverse jury findings into findings for the client deserves short shrift. Moreover, in this instance the proposed interpretation of the verdict form and answers is neither literally tenable nor consistent with a commonsense reading of the questions.

Every sub-part after (a)(1) of Questions 2 through 5 was to be answered by the jury only if they answered YES to (a)(1). Every sub-part after (a)(2), up to (d), was to be answered only if they also answered YES to (a)(2). In this context, "was it" in (b) is most reasonably interpreted as referring to whatever property damage the jury had found came within both (a)(1) and (a)(2). Similarly, "this kind of property damage" in (c) is most reasonably interpreted as referring to whatever property damage the jury had found came within both (a)(1) and (a)(2), as well as (b). It is unreasonable to read parts (a), (b), and (c) together as allowing the jury to find property damage of two different kinds in

answering parts (a) and (b)—the "arising" kind and the "not arising" kind—and never asking them to specify at what site, if any, they found the "not arising" kind. If Interex counsel thought the evidence would support findings of property damage of the "not arising" kind, they had ample opportunity to propose additional questions for inclusion in the verdict form to get specific findings. The effort to interpret the verdict form, after verdict, in the way they now assert is not a tenable position.

The literal untenability of Interex's new post-verdict interpretation of the verdict form is underscored by the fact that Interex does not suggest that the jury findings should be interpreted as saying there was some other kind of property damage as well as that arising out of release or discharge of waste material into or upon the *Plymouth site in 1979–80* or the *Bridgewater site in 1980–81.* Yet, if their proposed interpretation of the questions were accepted, a YES finding to any of (c)(i)-(iv) would say no more than a NO finding about whether, in addition to property damage arising from release or discharge, there was also property damage from an "occurrence," defined in the way Interex proposes, that did not involve a release or discharge.

■ Another fallacy in the Interex syllogism is the assumed meaning of "occurrence." Interex contends that the contract definition of "occurrence" is so broad that an occurrence is ongoing as long as any harm from loss of use of property continues as a result of presence in or upon the property of any contaminant deposited there years earlier. Thus, the argument goes, an "occurrence" type of liability insurance coverage, in each new policy period, provides more coverage, added to that existing under policies for previous policy periods, until all contaminants that impair use of the property have been removed. Such an interpretation of liability insurance contracts would indeed tap vastly more insurance resources to help pay for the consequences of ill-advised toxic waste disposal. But a moment's reflection on the resulting extraordinary expansion of coverage, beyond anyone's reasonable expecta-

tions at the time of issuance of liability insurance coverage over several decades past, is enough to cause a court concern about fidelity to the judicial role. Taking this course, a court would be engaging in that kind of lawmaking that occurs when a court (a) searches assiduously for ambiguity and resolves it in favor of expanding coverage beyond objectively reasonable expectations, or (b) invokes an overriding public interest in protection of the environment to expand coverage beyond the terms of the contract between the parties, construed in accordance with ordinary rules of contract law.

In an attempt to bolster its proposed expansive interpretation of "occurrence," Interex points to the contractual phrase, defining the term "occurrence" to mean

> an accident, including continuous or repeated exposure to conditions which results in **property damage** neither expected nor intended from the standpoint of the insured; ...

Interex passes over, without comment, the literal requirement of "accident" as part of the definition of "occurrence." An interpretation that yields a concept of an indefinitely ongoing "accident" is an even greater strain on the words used than just the concept of an ongoing "occurrence." And the problem is not resolved by the "including" phrase, which can reasonably be interpreted as including only "[accidental] continuous or repeated exposures."

> Cf. *New Hampshire Ball Bearings v. Aetna Casualty & Surety Co.,* [43 F.3d 749, 754] (1st Cir.1995) (given the facts and circumstances of the case, the definition of "occurrence" did not include the intentional dumping of hazardous waste by the insured because it was not an "accident");
>
> *Mottolo v. Fireman's Fund Ins. Co.,* No. 94–1707, *slip op.* at 5–7 [43 F.3d 723, 726–27] (1st Cir. Jan. 3, 1995) (even though insured did not intend to injure property, the dumping of waste by the insured did not constitute an "accident" for the purposes of the definition of "occurrence" in this particular instance).

The court's charge to the jury stated essentially this same point when saying (at p. 33),

"a continuous or repeated exposure that is an accident."

Interex counsel, to their credit, noted this instruction in the court's charge requiring "a continuous or repeated exposure that is an accident." (Docket No. 243 at 7). But their argument disregards its meaning. Moreover, the phrase "including continuous or repeated exposure to conditions" is qualified by the words immediately following which may be read as qualifying the word "accident" as well, but plainly qualify the phrase "continuous or repeated exposure". The qualifying phrase "which results in **property damage**" takes us to another definition that says:

> "**property damage**" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, ...

█ It is true that the policy language is not a model of clarity. But ambiguity does not aid a party, under settled doctrines of resolving ambiguities in favor of the policyholder, unless the ambiguity relates to whether the particular interpretation proposed by the policyholder is one that might reasonably be advanced by a reader who is trying to understand the manifested meaning.

> See, e.g., *NASCO, Inc. v. Public Storage, Inc.,* 29 F.3d 28, 33 (1st Cir.1994);
>
> *Bird v. Centennial Ins. Co.,* 11 F.3d 228, 232 (1st Cir.1993);
>
> *Vickodil v. Lexington Ins. Co.,* 412 Mass. 132, 587 N.E.2d 777 (1992);
>
> *cf. Bourque v. FDIC,* 42 F.3d 704, 709 (1st Cir.1994);
>
> *Buirkle v. Hanover Ins. Co.,* 832 F.Supp. 469, 482–83 (D.Mass.1993).

Interex has not called to my attention any precedent supporting its theory of indefinitely ongoing occurrences, and I am aware of none. Also, despite invitations to do so, Interex never proffered a proposed instruction incorporating this theory into an explanation suitable for inclusion in the charge to the jury explaining Questions 2 through 5. In these circumstances, I have interpreted the policy definition of "occurrence" somewhat

less generously than Interex proposes, and instructed the jury accordingly.

Of course, whatever the ultimate resolution of the Interex contention may be, in this or other litigation, it cannot be taken as the basis for interpreting answers of a jury instructed as was this jury in the charge given in this case.

### D.

I turn, next, to a statement of what I believe to be the commonsense interpretation of the relevant jury answers in this case.

The contract definitions of "occurrence" and "property damage" that are quoted, above, were stated for the jury in the charge. These definitions tell us, and told the jury, that, subject to other terms of the policy, its liability insurance coverage concerns property damage occurring during the policy period that was neither expected nor intended from the standpoint of Interex and resulted from an accident, including continuous or repeated exposure to conditions.

Stated elsewhere in the policy is the "pollution exclusion clause," saying that this insurance does not apply to property damage

arising out of the discharge, disposal, release or escape of ... acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; ...

Following the semicolon in the "pollution-exclusion clause" is a provision commonly called the "exception to the exclusion." It states:

but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

In answering YES to parts (a)(1) and (a)(2) of Questions 2 through 5, the jury found that the PRP letters made claims and potentially made claims against Interex based on property damage that happened during each policy period and were caused by an occurrence.

In answering YES to part (b) of Questions 2 through 5, the jury found that the property damage *that was the subject of these claims and potential claims* did arise out of the release or discharge of waste materials or other contaminants into or upon land, water, or air of one of the Cannons sites.

■ Interex's contention (that the jury's answers meant, instead, that they found that other property damage, happening during policy years, did not "arise out of the release or discharge of waste materials or other contaminants into or upon land, water, or air of one of the Cannons cites") is premised on another contention it makes about the meaning of "occurrence" as defined in the insurance contract—a contention about indefinitely ongoing occurrences, explained above, that the court declined to accept in fashioning the verdict form and charge to the jury. I need not and do not consider at this time Interex's contention that my decisions in fashioning the verdict form and charge were erroneous and, if so, whether Interex's ambiguous proposals as to any different way of framing the questions and the charge explaining them were sufficient to preserve the point for later motions before the trial court and for appeal. The present inquiry is directed, instead, to what the jury's answers mean. And they are to be interpreted on the assumption that the jury applied the definition and explanation of "occurrence" given in the charge—not some quite different instruction that Interex contends should have been given. Reinforcing this point is the fact that even now, Interex has offered no explanation of exactly what is its proposed definition of "occurrence" and how that definition could be determined to be consistent with the terms of the insurance contract itself, or the contract as modified by any overriding rules of law for which Interex can cite precedents that are on point.

Having given answers in parts (a) and (b) that have the meaning explained above, the jury then found in answering the first pair of blanks in part (c) to Questions 2 through 5 that the only Cannons sites at which "this kind of property damage" occurred were Plymouth (in the 1979–80 policy period) and Bridgewater (in the 1980–81 policy period). In answering the remaining blanks in part (c), they found that "this kind of property damage" at the Plymouth site was not the result of a sudden release or discharge. As to "this kind of property damage" at the

Bridgewater site, they found that there was no preponderance of the evidence either way as to whether it was the result of a sudden release or discharge.

This is the most reasonable interpretation of the jury verdict.

### E.

If it should be determined instead that the verdict form left uncertainty about whether the jury found that property damage not arising from release or discharge of contaminants occurred during a policy period at one or more of the Cannons sites and that Fed. R.Civ.P. 49(a) therefore left this question to be decided by the trial judge, I find by a preponderance of the evidence received at the Phase–One Trial that the evidence shows no occurrence of property damage as defined in the contract at any of the sites other than the property damage at the Plymouth and Bridgewater sites identified in the jury verdict.

I make this finding on the evidence, independently of my interpretation of the jury answers. My belief that my finding is consistent with the jury's findings is reinforced, however, by the fact that the incidents on which the jury findings are most likely based are readily identifiable: leaks (the substantiality of which was disputed) in the seams of a storage tank at the Plymouth site in 1979–80 and (on disputed evidence) an original release of contaminants in 1980–81 at the Bridgewater site. Evidence was sufficient to support findings that each of these leaks discharged liquid waste materials into soil nearby but still on site.

### F.

If a court were to accept the proposed Interex interpretation, the Verdict Form would have been deeply flawed in another respect. It would have been inadequate to tell the parties and the court whether it would be necessary, before determining final judgment, to address and resolve another unsettled question that has produced conflict among the states: If both covered and non-covered claims have been made or potentially made, are all the liability insurance companies that issued policies for different policy

years to be held jointly and severally liable, under the duty to indemnify or the duty to defend, or both, for all of the remediation costs for all years, or is some principle of allocation among insurers and between insurers and the insured to be applied where some claims and potential claims are uncovered and others are covered?

Because of this unsettled question, the Interex argument for the sweeping judgment on the verdict that it has requested would have to be rejected even if all the other flaws in the Interex position, explained above, were overlooked.

### VI.

The parties to this action disagreed on a number of relevant legal issues. Set out below are (A) key issues that could not be disputed under current Massachusetts precedents, (B) other issues that were disputed but were mooted by the jury findings in this case, and (C) those issues of law that remain for this court to decide.

### A. Issues of Law Established in Massachusetts

■ **1. Duty to Defend.** The duty to defend is broader than the duty to indemnify. E.g., Sterilite Corp. v. Continental Cas. Co., 17 Mass.App.Ct. 316, 318 n. 4, 458 N.E.2d 338 (1983), rev. denied, 391 Mass. 1102, 459 N.E.2d 826 (1984). The duty arises if a claim is made that potentially, even if not explicitly, states a claim that would be covered under the policy. That is, the insurer is obligated to defend if the allegations in the suit are "reasonably susceptible" of an interpretation that they state a claim covered by the policy. Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 146, 461 N.E.2d 209 (1984).

■ **2. "Sudden."** Unlike some other jurisdictions, Massachusetts has determined that the word "sudden" in the exception clause of the pollution exclusion is not ambiguous. See Lumbermens Mutual Cas. Co. v. Belleville Indus., Inc., 407 Mass. 675, 555 N.E.2d 568, 572 (1990). In addition, the word "sudden" has a temporal quality and relates to the abruptness of the commence-

ment of the discharge. *See id.; see also Goodman v. Aetna Cas. & Sur. Co.,* 412 Mass. 807, 593 N.E.2d 233 (1992).

■ **3.** *"Sudden and accidental."* In some jurisdictions, the courts interpret the phrase "sudden and accidental" from the standpoint of the insured. The Massachusetts Supreme Judicial Court has ruled that, in interpreting this phrase of the policy, the "point of view of the insured is immaterial." *Polaroid Corp. v. Travelers Indem. Co.,* 414 Mass. 747, 610 N.E.2d 912 (1993). Thus, if "a third person who discharged a pollutant did so intentionally, the pollution exclusion denies coverage, even to an innocent insured." *Id.* 610 N.E.2d at 916.

**B.** *Issues of Law Mooted by Jury Findings*

**1.** *Choice of Law.* The insured argued that New Hampshire law should be applied to legal issues in this case involving the two sites in Londonderry and Nashua, New Hampshire. The court did not, before submitting questions to the jury, determine whether the insured would prevail on this contention under the Massachusetts "flexible, multi-factor, interest-analysis" used for choice of law decisions.

> *E.g., Bi–Rite Enterprises, Inc. v. Bruce Miner Co.,* 757 F.2d 440, 442 (1st Cir. 1985);
>
> *see also A. Johnson & Co. v. Aetna Cas. & Sur. Co.,* 741 F.Supp. 298 (D.Mass.1990), *aff'd* 933 F.2d 66 (1st Cir.1991) (undertaking a similar choice of law analysis).

After receiving the jury verdict, I have concluded that this question has now been rendered moot by the jury responses to Questions 2(c)(iii), 2(c)(iv), 3(c)(iii), 3(c)(iv), 4(c)(iii), 4(c)(iv), 5(c)(iii) and 5(c)(iv), in which the jury found that the two New Hampshire sites were not affected by the contested legal issues involving the pollution exclusion. Determining the final judgment for these two sites is a matter of contract interpretation under rules of law that do not differ in Massachusetts and New Hampshire (*see* Part VII below); therefore the choice of law for these two sites is irrelevant. The other two sites are both in Massachusetts, and Massa-

chusetts law will be applied to decide the disputed legal questions involving these sites.

**2.** *Timing of Occurrence.* The insured argued that even in an "occurrence" policy, certain property damage that happened during the policy period should be covered by the policy, even if the occurrence that caused the damage happened *before* the policy period. In support of this proposition, the insured cited case law, which could conceivably be read to allow coverage for pre-policy occurrences. This legal question was rendered moot, however, by the jury responses to Questions 2(a)(2), 3(a)(2), 4(a)(2), and 5(a)(2). In each of these answers, the jury found that the property damage that they found was property damage caused by an occurrence that happened during the policy period. Thus there was no issue regarding a pre-policy occurrence for the court to resolve.

**3.** *Viewpoint for "accidental."* Although Massachusetts law on this issue is clear, Interex requested jury findings on whether each discharge of pollutants was "accidental from the standpoint of the insured" (in addition to findings, which the court had determined it would ask for, as to whether each was "accidental from the standpoint of the person causing the discharge"). *See* Questions 2(c), 3(c), 4(c), and 5(c). These questions were arguably relevant to a decision under New Hampshire law, but this issue is now moot because under the jury findings, no coverage existed as to New Hampshire sites in any event and only Massachusetts law applies to coverage for claims and potential claims regarding the sites in Massachusetts.

The application of Massachusetts law to the jury findings has been addressed to some extent in Part V above and will be addressed further in Parts VII and VIII below.

**C.** *Remaining Issues of Law*

The remaining issues center on the burden of proof for the "sudden and accidental" exception to the pollution exclusion. One question is this:

> When an insured is seeking indemnification, is the burden of proving that a release was "sudden and accidental" on the insured or on the insurer?

A related issue is whether a different party has the burden of proof on "sudden and accidental" when the insured is seeking to enforce the duty to defend as distinguished from the duty to indemnify.

The Massachusetts Supreme Judicial Court has not decided either of these questions. *See Polaroid,* 610 N.E.2d at 916, n. 7 ("[W]e need not decide whether the insurer or the insured has the burden of proof on the question of the sudden and accidental nature of any discharge."). The only ruling the SJC has made on this subject is that when an insurer is in *breach* of its duty to defend, the burden of proving "sudden and accidental" is on the insurer. *See id.* at 922, n. 22. Whether Atlantic Mutual was at any time before the Phase–One Trial in breach of its duty to defend depends on the jury answers in this trial and the allocation of the burden of proof in this trial. This latter issue is considered next.

## VII.

■ It is hornbook law that the insured has the burden of proving that its claimed loss falls within the coverage of the insurance policy. *See* 19 G. Couch, *Couch on Insurance 2d* § 79:315 (Rev. ed.) (1983). Once the insured meets this burden, the insurer must then bear the burden of showing that a policy exclusion eliminates coverage for the otherwise covered loss. *See id.* When an exclusion from coverage has an *exception* that partially restores coverage, authorities are split on which party has the burden of proving the exception. *See, e.g., id.* § 79:335 (stating that, in 1983, the burden of proving an exception to an exclusion was generally on the insurer, but that a minority view placed the burden on the insured).

■ Taking account of recent developments, I conclude that the majority of state courts now place the burden on the insured as to the "sudden and accidental" exception from the pollution exclusion.

*See, e.g., St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195 (1st Cir.1994) (Rhode Island law);

*Aeroquip Corp. v. Aetna Cas. & Sur. Co.,* 26 F.3d 893 (9th Cir.1994) (California law);

*Northern Ins. Co. v. Aardvark Assocs., Inc.,* 942 F.2d 189 (3d Cir.1991) (Pennsylvania law);

*American States Ins. v. Mankato Iron & Metal,* 848 F.Supp. 1436 (D.Minn.1993) (Minnesota law);

*Hudson Ins. Co. v. Double D. Mgmt. Co., Inc.,* 768 F.Supp. 1542 (M.D.Fla.1991) (Florida law);

*Covenant Ins. Co. v. Friday Engineering, Inc.,* 742 F.Supp. 708 (D.Mass.1990) (Massachusetts law, but citing case based on Maine law as the standard recognized in "this district");

*A. Johnson & Co. v. Aetna Cas. & Sur. Co.,* 741 F.Supp. 298 (D.Mass.1990) (Maine law), *aff'd* 933 F.2d 66 (1st Cir.1991);

*Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 702 F.Supp. 1317 (E.D.Mich.1988) (Michigan law).

The minority view places the burden for proving "sudden and accidental" on the insurer.

*See, e.g., New York v. Blank,* 27 F.3d 783 (2d Cir.1994) (New York law);

*New Castle Co. v. Hartford Acc. & Indem. Co.,* 933 F.2d 1162 (3d Cir.1991) (Delaware law);

*Remington Arms Co. v. Liberty Mut. Ins. Co.,* 810 F.Supp. 1406 (D.Del.1992) (Connecticut law);

*United States Fidelity & Guar. Co. v. Morrison Grain Co.,* 734 F.Supp. 437 (D.Kan.1990) (Kansas law), *aff'd* 999 F.2d 489 (10th Cir.1993).

These cases, in both the majority and minority camps, generally do not distinguish between the burden of proof for the duty to indemnify and the burden of proof for the duty to defend.

Although the Supreme Judicial Court has not determined on which party the burden of proof rests under Massachusetts law, the Court of Appeals for the First Circuit has twice taken the position, when interpreting the laws of other states, that the burden of proof should fall on the insured.

*See St. Paul Fire & Marine Ins. Co.,* 26 F.3d 1195 (Rhode Island law);

*A. Johnson & Co. v. Aetna Cas. & Sur. Co.,* 933 F.2d 66 (1st Cir.1991) (Maine law). In choosing this position, the First Circuit reasoned:

> Once the insurer has established that the pollution exclusion applies, coverage depends on the applicability of the exception. Because the insured bears the burden of establishing coverage under an insurance policy, it makes sense that the insured must also prove that the exception affords coverage after the exclusion is triggered.

*Warwick,* 26 F.3d at 1200.

Or, stated another way, this allocation makes sense because it "aligns the burden with the benefit." *Aeroquip Corp.,* 26 F.3d at 895. In addition, if the burden were placed on the insurer, a property owner might then have the unfortunate incentive to remain ignorant about the cause of any release or discharge in order to increase the chance of coverage. It is not likely that Massachusetts courts would favor creating such an incentive.

For these reasons, I conclude that, when the Supreme Judicial Court addresses this issue, it will decide that in Massachusetts, the burden of proving that a release was "sudden and accidental" rests with the insured. This is true whether the insured is seeking to enforce the duty to pay or the duty to defend, as there is no persuasive reason to distinguish between these different contexts in which this issue arises. Only if the insurer is already in breach of its duty to defend for some other reason will the burden shift to the insurer to prove both the exclusion and the exception to the exclusion.

## VIII.

Applying this law to the jury's findings, I conclude that judgment must enter for the defendant for the sites in Massachusetts because the plaintiff did not meet its burden of proof on the "sudden and accidental" exception to the pollution exclusion.

The jury found that the plaintiff met its burden of proving, by a preponderance of the evidence, that the claimed loss was of a type within the general policy provisions. That is, the jury answered YES to the question:

(1) Did one or more of the PRP letters, considered by itself or in combination with other PRP letters,

> make one or more claims against Interex based on property damage that happened during a policy period, and that was caused by an occurrence?

*See* Jury's Responses to Question 2(a)(1) (for the 1979–80 period) and 3(a)(1) (for the 1980–81 period). The jury also answered YES to the related questions, finding that there was also a *potential* claim of covered property damage. *See* Jury's Responses to Questions 4(a)(1) (for the 1979–80 period) and 5(a)(1) (for the 1980–81 period).

The jury then found, by answering YES to the following question, that the defendant, Interex, met its burden of proving that the covered loss at two sites was within the "pollution exclusion" from coverage:

(2) [If you found a claim of property damage above,] was it property damage arising out of a discharge, dispersal, release or escape of waste materials or other pollutants into or upon land, water, or air of one of the [relevant] sites?

*See* Jury's Responses to Questions 2(b) (for the 1979–80 period) and Question 3(b) (for the 1980–81 period). The jury answered YES to this question and found that "this kind of property damage" occurred at *Plymouth* during the 1979–80 period (response to Question 2(c)(ii)) and at *Bridgewater* during the 1980–81 period (response to Question 3(c)(i)). The jury did not find that property damage of the generally covered type occurred at the other two sites.

The jury made identical findings on the questions whether potential claims of covered losses were potentially ones that involved the discharge of waste materials into or upon land, water or air. That is, at Plymouth and Bridgewater the potential claims for covered losses that were for property damage of the generally covered type were also within the type to which the pollution exclusion applies. *See* Jury's Responses to Questions 4(b), 4(c)(ii), 5(b) and 5(c)(i).

The jury was then asked to find, for the Plymouth and Bridgewater sites, whether the claim, or a potential claim, was for property damage arising from a release that was "sudden" and was "accidental." Because there is a dispute of law on the allocation of the burden of proof, the verdict form gave the jury a three-way option of

finding YES by a preponderance of the evidence,

finding NO by a preponderance of the evidence, or

finding that there was not a preponderance of the evidence either way.

The court instructed the jury that their answer had to be unanimous. They were not permitted to take the third option simply because they were not unanimous as to either of the others. Rather, if they could not arrive at a unanimous answer, they were to report that fact to the court rather than taking the third option as their answer.

On the question whether the release at the Plymouth site was sudden, the jury found "NO, by a preponderance of the evidence." *See* Jury's Response to Question 2(c)(ii). This finding bars plaintiff's claim for indemnity coverage for the Plymouth site, because although property damage occurred, it was caused by a release or discharge of waste materials that was not sudden and accidental, and thus is excluded from coverage under the pollution exclusion.

As a second ground of decision, I conclude that plaintiff's claim for indemnity at the Plymouth site is also barred by the jury's finding that, by a preponderance of the evidence, the release was NOT "accidental from the standpoint of the person causing the discharge." As explained above, in Massachusetts the relevant standpoint for evaluating "accidental" is the standpoint of the person who causes the discharge, not the standpoint of the insured. Thus the jury finding that the discharge was accidental from the standpoint of Interex is irrelevant, and plaintiff's indemnification claims for this site at Plymouth are barred because the releases were not accidental and thus were excluded from coverage under the pollution exclusion.

On the potential-claim questions for Plymouth, the jury took the third option—"We find there is not a preponderance of the evidence either way"—on whether the release was sudden and on whether the release was accidental from the standpoint of the person causing the discharge. Answer to Question 4(c)(ii). Because the jury took the third option in answering 4(c)(ii), I must resolve the disputed issue of law regarding burden of proof. Based on my determination that, in Massachusetts, the *insured* has the burden of proving, by a preponderance of the evidence, that a claim was potentially for a release that was sudden and accidental, I conclude that plaintiff's claims for defense coverage are barred for failure to meet its burden of proof on both the "sudden" and the "accidental" components, as well as the combined "sudden and accidental" exception, to the pollution exclusion.

For the generally covered type of property damage at the Bridgewater site, the jury again took the third option in answering Questions 3(c)(i) and 5(c)(i). That is, as to the releases at this site, they found that there was no preponderance of the evidence either way as to whether the release was "sudden" and "accidental." For the reasons stated above, I conclude that plaintiff had the burden of proving "sudden and accidental." The jury findings demonstrate that plaintiff failed to meet this burden for all claims for coverage. All of plaintiff's claims for coverage are therefore barred.

## IX.

 Interex included in its complaint against Atlantic Mutual a count for violation of Mass.Gen.L. ch. 93A.

Under the order for Phase–One Trial, this count was tried before the court simultaneously with the jury trial, except that the court heard out of the presence of the jury evidence admissible in relation to the Chapter 93A claim but not in relation to the claims tried before the jury.

I find that Interex has failed to meet its burden of proving a Chapter 93A violation.

I find, as did the jury in its response to Question 8, that Atlantic Mutual had a rea-

sonable basis for questioning the request for Atlantic Mutual to provide coverage for claims or potential claims asserted against Interex in the PRP letters.

Also, I find that the conduct of Atlantic Mutual, though less forthcoming than it should have been if it had been presented with a forthright claim by a person or persons it knew to be officers or authorized attorneys for Interex, did not reach the level of "rascality" required under Massachusetts law for one commercial entity to establish a Chapter 93A claim against another commercial entity.

> See *Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 583 N.E.2d 806 (1991);

> see also *Industrial General Corp. v. Sequoia Pacific Systems Corp.,* 44 F.3d 40, 45–46 (1st Cir.1995);

> *Compagnie de Reassurance D'Ile de France v. New England Reinsurance Corp.,* 825 F.Supp. 370 (D.Mass.1993).

Moreover, it is appropriate to evaluate the conduct of Atlantic Mutual in the context of the strikingly misleading conduct of Attorney Philip L. Comella, who was purporting to make a claim for Interex without ever offering to Atlantic Mutual any form of evidence from which Atlantic Mutual could determine what happened in the financial transactions that brought Comella's employer into the picture and what had happened to the Interex entity to which Atlantic Mutual had issued policies. This context strongly reinforces my finding that Atlantic Mutual's conduct was not a deceptive act or practice under Chapter 93A.

## X.

 The Interex complaint also included a count alleging violation of the implied covenant of good faith and fair dealing.

One aspect of this claim was submitted to the jury in Question 9(a), to which the jury answered that "Atlantic Mutual acted in violation of the implied covenant of good faith and fair dealing *in responding to the request for coverage* based on claims asserted in the PRP letters." (Emphasis added.)

Atlantic Mutual challenges the sufficiency of the evidence to support this finding. I regard this as a close and debatable issue but conclude I need not decide it. The reason is that in any event the Interex claim based on violation of the implied covenant of good faith and fair dealing fails for lack of a showing that the breach is of a kind and degree that would warrant the relief Interex seeks—a declaration of coverage—or that any other relief, such as damages, would be appropriate in the circumstances of this case.

I have concluded, in earlier parts of this Opinion, that Atlantic Mutual is entitled to judgment against Interex on all the Interex claims for coverage, both as to indemnity and as to defense. Thus, Atlantic Mutual was responding to nonmeritorious requests for coverage. Obiter dictum in a Massachusetts judicial opinion suggests that this fact in itself may be enough to defeat the Interex claim as a matter of law. See *Sarnafil, Inc. v. Peerless Ins. Co.,* 418 Mass. 295, 304, 636 N.E.2d 247 (1994).

Even if it is not alone enough to defeat the claim, I determine that it is among the circumstances shown in evidence that, taken together, do so as a matter of law in this case.

Among the other circumstances shown by the evidence are the indisputably less-than-forthcoming manner in which the request for coverage was first presented. Attorney Comella did not tell the whole story about his employer's relationship to Interex and how it happened that the request for coverage was coming from an officer or attorney of another entity, not the policyholder entity, Interex, Inc. Whether or not a factfinder would be compelled to find that Attorney Comella was deliberately withholding information that he knew would have a bearing on Atlantic Mutual's decisionmaking (an issue I do not decide), it is at least indisputable that information that would be regarded as material by any objectively reasonable decisionmaker in Atlantic Mutual's position was not disclosed and that this nondisclosure made the request for coverage incomplete in a way that made it materially misleading.

I do not suggest that this fact excused Atlantic Mutual's less than diligent response.

I do hold, however, that these circumstances weigh materially against awarding any relief in this case. As I stated to counsel in a conference shortly before submission of this case to the jury in the Phase–One Trial: the implied obligation of good faith and fair dealing is mutual, and if one side is withholding relevant information, that is relevant to what is reasonable conduct on the other side. It is also relevant, I conclude, to whether any remedy (even damages or some form of declaratory statement about the conduct) is appropriate when a jury has determined that the request for coverage was made on behalf of an insured entity that had no coverage under the policy in relation to the claims or potential claims for which it was requesting coverage.

Even if there may be some circumstances in which a claimant who is pressing only nonmeritorious claims against an insurer may have some kind of remedy under Mass. Gen.L. ch. 93A or for breach of the implied covenant of good faith and fair dealing, Interex has failed to show that this is such a case.

An additional circumstance of the present case is that Interex persisted in asserting that Atlantic Mutual was jointly and severally liable for the whole cost of defense while also asserting that Interex had a right to participate in controlling the defense, rather than turning it over to Atlantic Mutual alone, or to Atlantic Mutual jointly with other insurers. In short, Interex never offered to turn over the defense to Atlantic Mutual without attaching conditions it had no right to attach. Serious conflicts of interest among Interex, other alleged insurers for earlier policy periods, and Atlantic Mutual stood out like a sore thumb. Yet counsel for Interex sought to maintain control over the defense—thus holding a power to affect interests squarely in conflict with those of Interex—while calling upon Atlantic Mutual to pay the entire defense costs. Serious and unsettled issues of law would have been presented by these circumstances had not the jury verdict made them moot. Nevertheless, the existence of these circumstances and potential problems were a matter that a reasonable representative of a liability insurer in Atlantic Mutual's position could appropriate-ly consider in responding to the request for coverage presented and pressed by Interex.

Finally, it is a relevant factor that ordinarily breach without harm, at least when not willful—as the jury found in Answer 9(b)—is not actionable. *See Sarnafil, Inc.,* 418 Mass. at 304, 636 N.E.2d 247.

## XI.

A number of motions remain on the docket.

The court reserved until trial its decision on plaintiff's motion in limine for a ruling on evidence (Docket No. 185). Objections were to be made when the evidence was presented at trial. This motion in limine is now moot in light of the court's rulings during trial.

Two other motions are now moot for the same reason: Docket No. 213, plaintiff's motion for a ruling on objections to the trial deposition of Dr. Rosenberg is moot in light of the court's rulings on those objections at trial; Docket No. 216, defendant's motion in limine to preclude evidence, is moot in light of the evidentiary rulings at trial. These motions will be dismissed as moot.

The motion by defendant Atlantic Mutual for judgment as a matter of law (Docket No. 220) will be allowed to the limited extent set out in this opinion as an alternative ground of decision, and denied in other respects. Plaintiff's oral motion for a ruling as a matter of law (undocketed) will be allowed to the limited extent consistent with this opinion and denied in all other respects.

Plaintiff's motion to bar submission of certain questions to the jury (Docket No. 221) was denied in substance during conferences on the verdict form and will now be dismissed from the docket.

Plaintiff's motion to modify the charge to the jury (Docket No. 225) was allowed in part during the conferences on the charge and otherwise denied. It will now be dismissed from the docket.

## ORDER

For the foregoing reasons, it is ORDERED:

(1) Plaintiff's motion in limine for a ruling on evidence (Docket No. 185) is dismissed from the docket.

(2) Plaintiff's motion for a ruling on objections to the trial deposition of Dr. Rosenberg (Docket No. 213) is dismissed from the docket.

(3) Defendant's motion in limine to preclude evidence (Docket No. 216) is dismissed as moot.

(4) Defendant's motion for judgment as a matter of law (Docket No. 220) is dismissed from the docket.

(5) Plaintiff's oral motion for judgment as a matter of law is dismissed.

(6) Plaintiff's motion to bar submission of certain questions to the jury (Docket No. 221) is dismissed from the docket.

(7) Plaintiff's motion to modify the charge to the jury (Docket No. 225) is dismissed from the docket.

(8) A scheduling conference is set for 2:00 p.m., February 2, 1995, to consider whether Final Judgment for defendant should now be entered and, if not, to schedule further proceedings essential to prompt final disposition.

## APPENDIX A

### Verdict

1. Concerning Any Claim of Insurance Coverage

 It is undisputed in this case that, at the time the insurance policy in evidence was issued by Atlantic Mutual Insurance Company (hereinafter called "Atlantic Mutual") to a corporation having the name Interex Corporation (hereinafter called "Interex"), Interex was in existence and did have an office and place of business at the address shown on the policy. There is evidence before you that successive reorganizations of Interex occurred and that, after June 3, 1985, the same corporation (hereinafter called the "plaintiff corporation") was still in existence but had different officers and a different name, Clean Harbors of Natick, Inc. (hereinafter called "Clean Harbors").

 1(a). Do you find that, at any time before the trial of this case began,

 any officer or agent of the plaintiff corporation who, at the time had authority to act for the plaintiff corporation in doing so,

 submitted to Atlantic Mutual

 the CERCLA PRP letters from the government agencies of the United States of America, Commonwealth of Massachusetts, and State of New Hampshire (hereinafter called "government agencies")

 for the purpose of seeking coverage for the plaintiff corporation under a policy or policies of insurance issued by Atlantic Mutual?

 X YES _____ NO

 **If you answered NO to 1(a), skip to question 1(c).**

 1(b). If YES to 1(a), do you find that

 a person or persons then having authority to act for the plaintiff corporation provided to Atlantic Mutual information sufficient to enable Atlantic Mutual to verify that

 the plaintiff corporation was still in existence and

 that the request for coverage was made on behalf of the plaintiff corporation by an officer or agent who at that time had authority to act for the plaintiff corporation in making the request for coverage?

 X YES _____ NO

 **If you answered YES to 1(b), skip to question 1(d).**

 1(c). If NO to 1(b), do you find that

 Atlantic Mutual, before this trial began,

 obtained from any source information sufficient to enable Atlantic Mutual to verify that

 the plaintiff corporation was still in existence and

 that the request for coverage was made on behalf of the plaintiff corporation by an officer or agent who at that time had authority to act for the plaintiff corporation in making the request for coverage?

 _____ YES _____ NO

 **If you answered NO to 1(c), skip to question 1(e).**

1(d). If YES to either 1(b) or 1(c), at each of the times stated below, did Atlantic Mutual have information sufficient to enable it to verify
that the plaintiff corporation was still in existence and
that the request for coverage was made on behalf of the plaintiff corporation by an officer or agent who at the time of the request had authority to act for the plaintiff corporation in making the request?

| | | |
|---|---|---|
| On or about May 13, 1986 | X YES | _____ NO |
| On or about January 15, 1987 | X YES | _____ NO |
| On or about May 1, 1987 | X YES | _____ NO |
| On or about June 8, 1988 | X YES | _____ NO |

1(e). Do you find that before the PRP letters were sent to Atlantic Mutual by Chemical Waste Management, Inc., in 1986, Clean Harbors had agreed with Chemical Waste Management, Inc. that Chemical Waste Management Inc. would have authority to act for Clean Harbors for the purpose of requesting insurance coverage in the name of Interex?

X YES _____ NO

1(f). Do you find that Atlantic Mutual's conduct caused plaintiff corporation not to provide information in support of a request for coverage made to Atlantic Mutual and that plaintiff corporation otherwise would have provided the information if plaintiff corporation had not justifiably relied on a belief that Atlantic Mutual had indicated that no more information was needed?

X YES _____ NO

1(g). Did Atlantic Mutual intentionally give up a known right to deny coverage to Interex?

X YES _____ NO

2. Concerning Any Property Damage in the 1979–80 Policy Period

2(a)(1). Did one or more of the PRP letters, considered by itself or in combination with other PRP letters,
make one or more claims against Interex that you find to be
based on property damage
that happened during the period from noon on December 29, 1979 to noon on December 29, 1980, and
that was caused by an occurrence?

X YES _____ NO

**If you answered NO to 2(a)(1), skip to question 3.**

2(a)(2). If YES to 2(a)(1), did the occurrence that caused the property damage happen after noon on December 29, 1979?

X YES _____ NO

2(b). If YES to 2(a)(1), was it property damage arising out of the discharge, dispersal, release, or escape (hereinafter called "release" or "discharge") of waste materials or other contaminants into or upon land, water, or air of one of the Cannons sites?

X YES _____ NO

**If you answered NO to 2(b), skip to question 2(d).**

2(c). If YES to 2(b), at which site or sites did this kind of property damage occur?
(i) Bridgewater _____ YES X NO
If YES, did it arise out of a release:
— that was sudden?
_____ We find YES by a preponderance of the evidence.
_____ We find NO by a preponderance of the evidence.
_____ We find there is not a preponderance of the evidence either way.
— that was accidental from the standpoint of Interex?
_____ We find YES by a preponderance of the evidence.
_____ We find NO by a preponderance of the evidence.
_____ We find there is not a preponderance of the evidence either way.
— that was accidental from the standpoint of the person causing the discharge?
_____ We find YES by a preponderance of the evidence.
_____ We find NO by a preponderance of the evidence.

———— We find there is not a preponderance of the evidence either way.

(ii) Plymouth X YES ———— NO

If YES, did it arise out of a release:

— that was sudden?

———— We find YES by a preponderance of the evidence.

 X We find NO by a preponderance of the evidence.

———— We find there is not a preponderance of the evidence either way.

— that was accidental from the standpoint of Interex?

 X We find YES by a preponderance of the evidence.

———— We find NO by a preponderance of the evidence.

———— We find there is not a preponderance of the evidence either way.

— that was accidental from the standpoint of the person causing the discharge?

———— We find YES by a preponderance of the evidence.

 X We find NO by a preponderance of the evidence.

———— We find there is not a preponderance of the evidence either way.

(iii) Nashua ———— YES X NO

If YES, did it arise out of a release:

— that was sudden?

———— We find YES by a preponderance of the evidence.

———— We find NO by a preponderance of the evidence.

———— We find there is not a preponderance of the evidence either way.

— that was accidental from the standpoint of Interex?

———— We find YES by a preponderance of the evidence.

———— We find NO by a preponderance of the evidence.

———— We find there is not a preponderance of the evidence either way.

— that was accidental from the standpoint of the person causing the discharge?

———— We find YES by a preponderance of the evidence.

———— We find NO by a preponderance of the evidence.

———— We find there is not a preponderance of the evidence either way.

(iv) Londonderry ———— YES X NO

If YES, did it arise out of a release:

— that was sudden?

———— We find YES by a preponderance of the evidence.

———— We find NO by a preponderance of the evidence.

———— We find there is not a preponderance of the evidence either way.

— that was accidental from the standpoint of Interex?

———— We find YES by a preponderance of the evidence.

———— We find NO by a preponderance of the evidence.

———— We find there is not a preponderance of the evidence either way.

— that was accidental from the standpoint of the person causing the discharge?

———— We find YES by a preponderance of the evidence.

———— We find NO by a preponderance of the evidence.

———— We find there is not a preponderance of the evidence either way.

2(d). If YES to 2(a)(1), then with respect to the 1979–1980 period, at which site or sites, if any, do you find that property damage occurred that was neither expected nor intended from the standpoint of Interex, and

at which site or sites, if any, do you find that property damage occurred that was neither expected nor intended from the standpoint of the person causing the discharge?

(i) Bridgewater

—neither expected nor intended from the standpoint of Interex?

 X YES NO

—neither expected nor intended from the standpoint of the person causing the discharge?

 X YES NO

(ii) Plymouth

—neither expected nor intended from the standpoint of Interex?

 X YES NO

—neither expected nor intended from the standpoint of the person causing the discharge?

 YES X NO

(iii) Nashua

—neither expected nor intended from the standpoint of Interex?

 X YES NO

—neither expected nor intended from the standpoint of the person causing the discharge?

 X YES NO

(iv) Londonderry

—neither expected nor intended from the standpoint of Interex?

 X YES NO

—neither expected nor intended from the standpoint of the person causing the discharge?

 X YES NO

3. <u>Concerning Any Property Damage in the 1980–1981 Policy Period.</u>

3(a)(1). Did one or more of the PRP letters, considered by itself or in combination with other PRP letters,
make one or more claims against Interex that you find to be
based on property damage
that happened during the period from noon on December 29, 1980 to noon on December 29, 1981, and
that was caused by an occurrence?

 X YES NO

**If you answered NO to 3(a)(1), skip to question 4.**

3(a)(2). If YES to 3(a)(1), did the occurrence that caused the property damage happen after noon on December 29, 1980?

 X YES NO

3(b). If YES to 3(a)(1), was it property damage arising out of the discharge, dispersal, release, or escape (hereinafter called "release" or "discharge") of waste materials or other pollutants into or upon land, water, or air of one of the Cannons sites?

 X YES NO

**If you answered No to 3(b), skip to question 3(d).**

3(c). If YES to 3(b), at which site or sites did this kind of property damage occur?

(i) Bridgewater X YES NO

If YES, did it arise out of a release:

— that was sudden?

 We find YES by a preponderance of the evidence.

 We find NO by a preponderance of the evidence.

 X We find there is not a preponderance of the evidence either way.

— that was accidental from the standpoint of Interex?

 X We find YES by a preponderance of the evidence.

 We find NO by a preponderance of the evidence.

 We find there is not a preponderance of the evidence either way.

— that was accidental from the standpoint of the person causing the discharge?

 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 __X__ We find there is not a preponderance of the evidence either way.

(ii) Plymouth _____ YES __X__ NO

If YES, did it arise out of a release:
— that was sudden?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.
— that was accidental from the standpoint of Interex?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.
— that was accidental from the standpoint of the person causing the discharge?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.

(iii) Nashua _____ YES __X__ NO

If YES, did it arise out of a release:
— that was sudden?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.
— that was accidental from the standpoint of Interex?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.
— that was accidental from the standpoint of the person causing the discharge?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.

(iv) Londonderry _____ YES __X__ NO

If YES, did it arise out of a release:
— that was sudden?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.
— that was accidental from the standpoint of Interex?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.
— that was accidental from the standpoint of the person causing the discharge?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.

3(d). If YES to 3(a)(1), then with respect to the 1980–1981 period, at which site or sites, if any, do you find that property damage occurred that was neither expected nor intended from the standpoint of Interex, and

at which site or sites, if any, do you find that property damage occurred that was neither expected nor intended from the standpoint of the person causing the discharge?

(i) Bridgewater
—neither expected nor intended from the standpoint of Interex?
 X YES NO
—neither expected nor intended from the standpoint of the person causing the discharge?
 X YES NO

(ii) Plymouth
—neither expected nor intended from the standpoint of Interex?
 X YES NO
—neither expected nor intended from the standpoint of the person causing the discharge?
 X YES NO

(iii) Nashua
—neither expected nor intended from the standpoint of Interex?
 X YES NO
—neither expected nor intended from the standpoint of the person causing the discharge?
 X YES NO

(iv) Londonderry
—neither expected nor intended from the standpoint of Interex?
 X YES NO
—neither expected nor intended from the standpoint of the person causing the discharge?
 X YES NO

4. Concerning Any Potential Claim of Property Damage in the 1979–1980 Policy Period.
4(a)(1). Did one or more of the PRP letters, considered by itself or in combination with other PRP letters,
make one or more claims that
potentially, even if not explicitly, was a claim against Interex
based on property damage
that happened during the period from noon on December 29, 1979 to noon on December 29, 1980, and
that was caused by an occurrence?
 X YES NO

**If you answered NO to 4(a), skip to question 5.**
4(a)(2). If YES to 4(a)(1), did the occurrence that caused the property damage happen after noon on December 29, 1980?
 X YES NO

4(b). If YES to 4(a)(1), was it potentially a claim of property damage arising out of the discharge, dispersal, release, or escape (hereinafter called "release" or "discharge") of waste materials or other pollutants into or upon land, water, or air of one of the Cannons sites?
 X YES NO

**If you answered No to 4(b), skip to 4(d).**
4(c). If YES to 4(b), at which site or sites was it potentially claimed that this kind of property damage occurred?

(i) Bridgewater YES X NO
If YES, was the claim potentially, even if not explicitly, a claim that the release:

 — was sudden?
 We find YES by a preponderance of the evidence.
 We find NO by a preponderance of the evidence.
 We find there is not a preponderance of the evidence either way.

 — was accidental from the standpoint of Interex?
 We find YES by a preponderance of the evidence.
 We find NO by a preponderance of the evidence.

_____ We find there is not a preponderance of the evidence either way.
 — was accidental from the standpoint of the person causing the discharge?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.

(ii) Plymouth _____ YES _____ NO

If YES, was the claim potentially, even if not explicitly, a claim that the release:
 — that was sudden?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 __X__ We find there is not a preponderance of the evidence either way.
 — was accidental from the standpoint of Interex?
 __X__ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.
 — was accidental from the standpoint of the person causing the discharge?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 __X__ We find there is not a preponderance of the evidence either way.

(iii) Nashua _____ YES __X__ NO

If YES, did it arise out of a release:
 — that was sudden?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.
 — was accidental from the standpoint of Interex?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.
 — was accidental from the standpoint of the person causing the discharge?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.

(iv) Londonderry _____ YES __X__ NO

If YES, did it arise out of a release:
 — that was sudden?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.
 — that was accidental from the standpoint of Interex?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.
 _____ We find there is not a preponderance of the evidence either way.
 — that was accidental from the standpoint of the person causing the discharge?
 _____ We find YES by a preponderance of the evidence.
 _____ We find NO by a preponderance of the evidence.

_____ We find there is not a preponderance of the evidence either way.

4(d). If YES to 4(a)(1), then with respect to the 1979–1980 period, for which site or sites, if any, was there a claim that <u>potentially,</u> even if not explicitly, was a claim against Interex that property damage occurred that was neither expected nor intended from the standpoint of Interex, and

for which site or sites, if any, was there a claim that <u>potentially,</u> even if not explicitly, was a claim against Interex that property damage occurred that was neither expected nor intended from the standpoint of the person causing the discharge?

(i) Bridgewater
—neither expected nor intended from the standpoint of Interex?
 X YES _____ NO
—neither expected nor intended from the standpoint of the person causing the discharge?
 X YES _____ NO

(ii) Plymouth
—neither expected nor intended from the standpoint of Interex?
 X YES _____ NO
—neither expected nor intended from the standpoint of the person causing the discharge?
 X YES _____ NO

(iii) Nashua
—neither expected nor intended from the standpoint of Interex?
 X YES _____ NO
—neither expected nor intended from the standpoint of the person causing the discharge?
 X YES _____ NO

(iv) Londonderry
—neither expected nor intended from the standpoint of Interex?
 X YES _____ NO
—neither expected nor intended from the standpoint of the person causing the discharge?
 X YES _____ NO

5. Concerning Any Potential Claim of Property Damage in the 1980–1981 Policy Period.

5(a)(1). Did one or more of the PRP letters, considered by itself or in combination with other PRP letters,
make one or more claims that
<u>potentially,</u> even if not explicitly, was a claim against Interex
based on property damage
during the period from noon on December 29, 1980 to noon on December 29, 1981, and
that was caused by an occurrence?
 X YES _____ NO

**If you answered No to 5(a), skip to question 6.**

5(a)(1). If YES to 5(a)(1), did the occurrence that caused the property damage happen after noon on December 29, 1980?
 X YES _____ NO

5(b). If YES to 5(a)(1), was it potentially a claim of property damage arising out of the discharge, dispersal, release, or escape (hereinafter called "release" or "discharge") of waste materials or other pollutants into or upon land, water, or air of one of the Cannons sites?
 X YES _____ NO

**If you answered NO to 5(b), skip to question 5(d).**

5(c). If YES to 5(b), at which site or sites was it potentially claimed that this kind of property damage occurred?
(i) Bridgewater X YES _____ NO
If YES, was the claim potentially, even if not explicitly, a claim that the release:
— was sudden?
 _____ We find YES by a preponderance of the evidence.

_____We find NO by a preponderance of the evidence.
___X___ We find there is not a preponderance of the evidence either way.

— was accidental from the standpoint of Interex?
___X___ We find YES by a preponderance of the evidence.
_____We find NO by a preponderance of the evidence.
_____We find there is not a preponderance of the evidence either way.

— was accidental from the standpoint of the person causing the discharge?
_____ We find YES by a preponderance of the evidence.
_____ We find NO by a preponderance of the evidence.
___X___ We find there is not a preponderance of the evidence either way.

(ii) Plymouth _____ YES ___X___ NO

If YES, was the claim potentially, even if not explicitly, a claim that the release:

— was sudden?
_____ We find YES by a preponderance of the evidence.
_____ We find NO by a preponderance of the evidence.
_____ We find there is not a preponderance of the evidence either way.

— was accidental from the standpoint of Interex?
_____ We find YES by a preponderance of the evidence.
_____ We find NO by a preponderance of the evidence.
_____ We find there is not a preponderance of the evidence either way.

— was accidental from the standpoint of the person causing the discharge?
_____ We find YES by a preponderance of the evidence.
_____ We find NO by a preponderance of the evidence.
_____ We find there is not a preponderance of the evidence either way.

(iii) Nashua _____ YES ___X___ NO

If YES, was the claim potentially, even if not explicitly, a claim that the release:

— was sudden?
_____ We find YES by a preponderance of the evidence.
_____ We find NO by a preponderance of the evidence.
_____ We find there is not a preponderance of the evidence either way.

— was accidental from the standpoint of Interex?
_____ We find YES by a preponderance of the evidence.
_____ We find NO by a preponderance of the evidence.
_____ We find there is not a preponderance of the evidence either way.

— was accidental from the standpoint of the person causing the discharge?
_____ We find YES by a preponderance of the evidence.
_____ We find NO by a preponderance of the evidence.
_____ We find there is not a preponderance of the evidence either way.

(iv) Londonderry _____ YES ___X___ NO

If YES, was the claim potentially, even if not explicitly, a claim that the release:

— was sudden?
_____ We find YES by a preponderance of the evidence.
_____ We find NO by a preponderance of the evidence.
_____ We find there is not a preponderance of the evidence either way.

— was accidental from the standpoint of Interex?

——————— We find YES by a preponderance of the evidence.

——————— We find NO by a preponderance of the evidence.

——————— We find there is not a preponderance of the evidence either way.

— was accidental from the standpoint of the person causing the discharge?

——————— We find YES by a preponderance of the evidence.

——————— We find NO by a preponderance of the evidence.

——————— We find there is not a preponderance of the evidence either way.

5(d). If YES to 5(a)(1), then with respect to the 1980–1981 period, for which site or sites, if any, was there a claim that <u>potentially</u>, even if not explicitly, was a claim against Interex that property damage occurred that was neither expected nor intended from the standpoint of Interex, and

for which site or sites, if any, was there a claim that <u>potentially</u>, even if not explicitly, was a claim against Interex that property damage occurred that was neither expected nor intended from the standpoint of the person causing the discharge?

(i) Bridgewater

—neither expected nor intended from the standpoint of Interex?

 X YES ——————— NO

—neither expected nor intended from the standpoint of the person causing the discharge?

 X YES ——————— NO

(ii) Plymouth

—neither expected nor intended from the standpoint of Interex?

 X YES ——————— NO

—neither expected nor intended from the standpoint of the person causing the discharge?

 X YES ——————— NO

(iii) Nashua

—neither expected nor intended from the standpoint of Interex?

 X YES ——————— NO

—neither expected nor intended from the standpoint of the person causing the discharge?

 X YES ——————— NO

(iv) Londonderry

—neither expected nor intended from the standpoint of Interex?

 X YES ——————— NO

—neither expected nor intended from the standpoint of the person causing the discharge?

 X YES ——————— NO

6. <u>Concerning Defense Costs</u>

6(a). Has the plaintiff proved, by a preponderance of the evidence, what percentage of the total defense costs were incurred as a result of claims and potential claims covered under the Atlantic Mutual policies?

——————— YES X NO

If YES, what percentage? ———————%

6(b). Has the defendant proved, by a preponderance of the evidence, what percentage of the total defense costs were NOT incurred as a result of claims and potential claims covered under the Atlantic Mutual policies?

——————— YES X NO

If YES, what percentage? ———————%

7. Do you find that the person or persons making the request to Atlantic Mutual for coverage in the name of Interex did so in good faith and with a reasonable basis for doing so?

 X YES ——————— NO

8. Do you find that Atlantic Mutual had a reasonable basis for questioning the request for Atlantic Mutual to provide coverage for claims or potential claims asserted in the PRP letters?

 X YES ——————— NO

9(a). Do you find that Atlantic Mutual acted in violation of the implied covenant of good faith and fair dealing in responding to the request for coverage based on claims asserted in the PRP letters?

 __X__ YES _____ NO

9(b). If YES to 9(a), was this violation willful and knowing?

 _____ YES __X__ NO

[7/22/94] [signed]

Date Foreperson

---

## APPENDIX B

### UNITED STATES DISTRICT COURT

### DISTRICT OF MASSACHUSETTS

Interex Corporation, Plaintiff

v.

Atlantic Mutual Insurance
Company, Defendants

Civil Action No. 88–1380–K

### Charge to the Jury

**MEMBERS OF THE JURY:**

You have heard the evidence and the arguments in this case. It is now my duty to instruct you on the law that you must follow and apply. When I have finished, you will begin your discussion with each other—what we call your deliberations.

To help you understand and remember these instructions on the law, I will divide them into three main parts: *First,* general instructions, intended to guide you throughout your deliberations; *second,* instructions about the claims and defenses in this case and the questions you are to answer; *third,* instructions about your procedures during deliberations.

I am giving you these instructions orally now. A copy in print will be in your hands as you deliberate.

 * * * * * *

### Part II.

In this case, I will submit questions to you, and you have copies of these questions in your hands.

Before turning to the particular questions, I will explain some rules of law and some customary insurance practices that you need to understand as a background.

We commonly speak of the insurance company that issues an insurance policy as the insurer. We ordinarily call the policyholder the insured. We use the phrase "the coverage of the policy" to refer to the principal kind of protection the particular insurance policy provides.

Different kinds of insurance policies provide quite different kinds of coverage. For example, a life insurance policy provides what we call life insurance coverage—that is, benefits payable when, as we sometimes say, loosely speaking, the life that is insured is ended.

Another example is an automobile insurance policy, which usually provides several different kinds of coverage. The collision coverage, for example, provides benefits to the owner of a car identified in the policy when that car is damaged in a collision. The comprehensive coverage provides benefits, for example, when the car is damaged in a windstorm, or is stolen.

The liability insurance coverage of an automobile insurance policy provides benefits when the insured is sued by somebody else, in what we call a tort claim. We refer to the other person as a third person, counting the insurer and the insured as the first and second persons. Thus, a third person sues the insured, making a tort claim against the insured. Under the liability insurance coverage, the insurer has agreed, up to the limits and under the terms and conditions stated in the policy, to defend for the insured and to pay on behalf of the insured if the insured is held liable.

The kind of insurance coverage we are concerned with in this case is another form of liability insurance—one that is commonly is-

sued to business entities. Though different from automobile liability insurance in some respects, this form of liability insurance also involves three parties—the insurer, the insured, and one or more parties as third parties making claims against the insured.

**[Read Question 1]**

You will notice that Question 1 refers to CERCLA PRP letters.

"CERCLA" is simply the short name for a federal statute that imposes liability on certain parties (called "potentially responsible parties") for environmental damage. You do not need to be concerned with the requirements for making a claim under CERCLA.

A "PRP letter" is the name we use for the letters mailed by the federal and state governments to "potentially responsible parties" or "PRPs" under CERCLA. These letters are intended to notify the recipients that they are potentially responsible for paying for an environmental problem at a certain site.

To answer parts (a) through (d) of Question 1, you need to know some rules of law about authority of an officer or agent to act on behalf of a corporation such as Interex or Clean Harbors.

One who claims to be an agent cannot create his own authority. An officer or some other agent of the principal must be shown to have done something to create the authority. Authority may be express or implied, actual or apparent. Now, I will explain these terms.

The concept of apparent authority does not apply to parts (a) through (d) of Question 1, and I will not say any more about apparent authority right now. I will come back to "apparent authority" when I explain parts (f) and (g) of Question 1.

An agent for someone else, called a "principal," may have actual authority (express or implied) to act on behalf of the principal.

Express authority exists when the principal expresses its consent to have the agent act on its behalf. The consent may be oral or written. Express authority exists when the principal actually entrusts the other with the power to act on its behalf with respect to a particular matter.

Implied authority arises by virtue of the agent's position with, or relationship to, the principal. An agent has the implied authority to do all things necessary and reasonable to carry out something the principal has authorized the agent to do. Thus, implied authority is a natural extension of the express authority conferred on the agent by the principal.

When the alleged principal is a corporation, conduct of the principal means conduct of some other person than the alleged agent—that is, conduct of some officer of the corporation, or another person having authority over the alleged agent.

If you find, by a preponderance of the evidence, that an agent had actual authority, express or implied, to speak for the principal on this matter, you may take the statements of an agent (if you have so found) as made on behalf of the principal.

On the other hand, if you do not find, by a preponderance of the evidence, that an agent had actual authority, then you will find that the statement was not made on behalf of the principal.

Now I turn to Question 1(e).

An indemnification is an agreement whereby one person (the indemnitor) agrees to secure another person against loss or damage. An indemnitee is the person who is protected against loss or damage.

Subrogation is the substitution of one person in place of another, whether as a creditor, or as the possessor of another rightful claim, so that the one who is substituted succeeds to the rights of the other in relation to the claim, and the other's rights, remedies or securities.

When parties make an indemnity agreement, they may, but are not required to, agree also that the indemnitor will be subrogated to any rights of the indemnitee against third persons, including any insurer.

It will be for you to decide whether there was such an agreement between Clean Harbors of Natick, Inc. (as indemnitee) and Chemical Waste Management, Inc. (as in-

demnitor), that the indemnitor would be subrogated to insurance rights, if any, of the indemnitee.

If you find that there was such an agreement, then the indemnitor succeeds to the rights of the indemnitee.

Question 1(e) asks you whether you find that Chemical Waste Management, Inc. agreed to indemnify and has partially indemnified Interex Corporation for the losses it suffered in connection with the Cannons Engineering Corporation Superfund cases, and whether you also find that there was an agreement that the indemnitor, Chemical Waste Management, Inc. would be subrogated to any rights that Clean Harbors of Natick, Inc. has against an insurer.

The question whether any subrogation right would exist in the absence of an agreement is one of law for the court to decide; and that question will be decided by this court or a higher court.

Now I come to parts (f) and (g) of Question 1.

When I was instructing you about the authority of an officer or agent as applied to parts (a) through (d) of Question 1, I told you that the concept of apparent authority did not apply there. There, we were thinking about authority of some person to act for the plaintiff corporation in asserting a claim for coverage. In that setting, authority to speak for the plaintiff corporation could not be increased by apparent authority. Apparent authority is a concept that is used, when it applies, only *against* the principal, not *in favor of* the principal.

In relation to parts (f) and (g) of Question 1, on the other hand, you will be considering whether something an agent said or did can be used against Atlantic Mutual as the principal. In this kind of setting authority may be actual (express or implied) or apparent.

Apparent authority results from conduct by the principal and what that conduct manifests to a third person. Under the doctrine of apparent authority, a person's actions or words may bind a principal (in this instance, the corporation), even in the absence of actual authority (express or implied) if the "conduct of the principal" (as I have just defined

that phrase) causes a third party reasonably to believe that a particular person has the authority to make the representations or to enter into negotiations as the principal's agent. If the third party goes on to change its position in reliance on that reasonable belief, the principal is responsible in the eyes of the law just as if the person had been authorized in fact to act on behalf of the principal. The actions of the principal and the way they are interpreted by the third party must be considered in light of ordinary human experiences. Titles of office are relevant insofar as they may have some tendency to suggest executive responsibility, but they are not alone decisive as to apparent authority.

Apparent authority, however, cannot be established by the purported agent's own words or conduct. It can be established only by some other person's words and actions as an officer of the principal or as a person with supervisory authority. If, however, two persons are officers of the corporation on the same level of authority, the conduct and words of either may be the basis for a finding that the other has apparent authority to act as agent for the principal.

Evidence of apparent authority to enter into a particular agreement exists where a person has carried on negotiations regarding the agreement on behalf of the principal with the principal's full knowledge and acquiescence, and the principal has never expressly or impliedly manifested to the other parties involved in the negotiations that the person's authority was limited to negotiating and did not extend to entering into a binding agreement.

Now, I turn to Questions 2–5.

First, I call your attention to the captions, the similarities between these questions, and the differences.

Question 2 concerns

**Property Damage in the 1979–80 Policy Period.**

Question 3 is just the same, except that it is for the 1980–81 policy period.

Question 4 concerns any

**Potential Claim of Property Damage in the 1979–80 Policy Period.**

Question 5 is just the same as Question 4 except that Question 5 is for the 1980–81 period.

**[Now Read Question 2 in full.]**

Question 2 is about the claim for liability insurance coverage during the 1979–80 period. Question 3, which I will not read, is just the same except it covers the 1980–81 policy period.

When an insurer issues to its policyholder (called an "insured") a liability insurance policy, then, subject to stated terms and conditions and within the scope of the particular kind of liability insurance coverage it provides, the insurer promises to do two separate things for the insured.

First. The first promise is to pay on behalf of the insured all sums that the insured must pay as damages because of a covered claim or lawsuit brought against the insured by some third person. (In this case, the contention is that CERCLA claims have been brought against the insured by government agencies. That is, the government agencies are the third persons.) We refer to this kind of duty of a liability insurer, when it applies, as the duty to pay on behalf of an insured, or, in a shorter phrase, the duty to indemnify.

Second. The second promise of the liability insurer is a promise to defend the insured when the terms of the policy apply. I will explain the duty to defend more fully when we come to question 6.

In order to determine whether an insurer has a duty to indemnify an insured, the judge and the jury trying the case must look first to the insurance contract or contracts—that is, the insurance policy or policies—to see how the duty to indemnify is defined and whether the duty is limited. The trial judge decides, subject to review by a higher court, what the applicable legal rules are. The jury, as final judges of the facts, decides any fact questions that are material to the outcome of the case under the applicable legal rules. If the judge and jury find the answer in the contract, that answer controls. If they do not find the answer in the contract, then working together in their respective ways, as I have just explained, the judge and jury must decide how to answer any question that is not squarely answered in the contract between the parties.

When you and I undertake this task, it is our duty to come to a decision that gives effect to the agreement of the parties, as expressed in their contract, as far as possible, and to work out an answer that, as far as we can determine, is as compatible and consistent as we can possibly make it with all the terms of the contract expressed by the objective manifestations of the parties in their contract with each other.

Since this is the purpose and the spirit in which both you and I must approach our tasks, I will now tell you about the terms and clauses of the particular contract—that is, the insurance policy that was issued in this case—that may help us understand the agreement of the parties and answer the questions we must answer as consistently as possible with that agreement.

The insurance policy is in evidence as Plaintiff's Exhibit 11. At the bottom right corner of each page is a six-digit number. These numbers have been referred to during this trial as the Bates Numbers. These numbers were stamped on the documents, during preparations for trial of this case, just as a convenience. I will use these Bates Numbers to identify pages.

The upper right-hand area of the front cover of the policy, Bates No. 280655, shows that the insurance company [the insurer] is Atlantic Mutual Insurance Company and the insured is

Interex Corporation, Joseph Rosenberg, and Pasquale Russo dba Elverest Realty; Baybanks Associates Inc., under lease dated 8/23/79

3 Strathmore Road, Natick, MA 01760.

The liability insurance coverage provisions appear in SECTION II of the policy, entitled "Comprehensive General Liability Insurance Coverage Part," beginning on page 280681. You will notice that this and other pages in this "Part" of the policy have "SECTION II" near the bottom left corner of the page.

The coverage in which we are interested is called "COVERAGE B—PROPERTY DAMAGE LIABILITY." This part of the policy declares:

In consideration of the policy premium and subject to the policy provisions, the company [Atlantic Mutual] agrees with the named insured as follows:

I. ...

COVERAGE B—PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of

. . . . .

B. **property damage**

to which this insurance applies, caused by an **occurrence,** and the company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such ... **property damage,** even if any of the allegations of the suit are groundless, false, or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, ....

**Exclusions**

This insurance does not apply:

. . . . .

(f) to ... **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental; ....

The boldface words in the passage just quoted are words that are defined in the policy. The following definitions appear on the pages with Bates Nos. 280687 and 280688:

"**occurrence**" means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured;** ....

"**property damage**" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, ....

Among the insurance policy provisions I have called to your attention were definitions of two of the terms that appear in Question 2 (the question I read to you in full a few minutes ago). They are:

property damage occurrence.

Before I talk about these terms individually, I will give you instructions about things you need to think about in deciding the meaning of a word or phrase in a contract (including an insurance policy, as one form of contract). These instructions apply to any question about the meaning of the contract between the parties in any respect, including the definition or meaning of a word or a phrase that appears in a policy.

First. If the meaning is clear from the contract itself, that meaning applies unless the law steps in with some kind of regulation. There is no overriding regulation that applies to deciding the meaning of the insurance contract in this case.

Thus, if you find the meaning of the contract clear as to a point in issue, you apply that meaning.

Second. If there is a genuine ambiguity in the contract about some question of meaning you have to decide, then a rule of law permits you to resolve that ambiguity against the insurer. That is, among the reasonable meanings of the word that the contract allows, you must choose the meaning that most favors the *insured.* The basis for this rule is that the insurer ordinarily has more experience in insurance matters and has a better opportunity to draft the terms of the contract than does an insured, and it is appropriate to resolve against the insurer a genuine ambiguity of meaning in relation to the very question of meaning that you have to answer.

This rule applies even though the state regulates the insurance business and the policy forms.

This rule applies, however, only if the ambiguity is genuine and if it concerns not some other question of meaning but instead the very question of meaning you have to answer.

Remember that the First point, stated earlier, applies instead of this Second point if the meaning of the contract is clear on the particular question you are considering and the ambiguity concerns some other point—either another point that you will be considering in relation to another question, or another point that bears on none of the questions you have to consider.

Third. You should take into account reasonable expectations of the parties that bear upon any question of meaning not clearly answered in the contract itself. By reasonable expectations of an insured we mean the expectations that an ordinarily prudent person in the same or similar circumstances as that insured at the time the contract was made would have had at that time.

Fourth. If you are considering a question of meaning of the contract in some respect that is not clearly answered explicitly in the words, phrases, and structure of the insurance policy, it is appropriate for you to think about whether a meaning is nevertheless implicit, even if not explicit, in the transaction as a whole. In this respect, it is appropriate to bear in mind that insurance contracts ordinarily provide benefits for losses that are fortuitous or accidental.

Fifth. Insurers are also free to prepare and make contracts on terms that limit coverage to only defined kinds of accidental losses rather than covering all kinds of accidental losses. The policy in evidence in this case has such a limiting phrase when it says in exclusion (f) that to be a basis for coverage under the policy, a release or escape of toxic chemicals into the land, water, or air at a site must be "sudden and accidental."

Sixth. The same word is often used by different persons, or in different contexts, with quite different meanings. You must consider whether or not that has happened in this case in order to weigh and evaluate the opinion testimony you have heard.

You have heard opinions of an expert witness in this case about whether releases of toxic chemicals were "sudden," "abrupt" (a word you will notice is not used in the insurance policy), "unexpected," or "unintended." As I have said to you earlier, it is for you, after weighing all the evidence, to decide whether to credit each of these opinions and if so, how much weight to give it in your evaluation of all the evidence bearing on each question you answer.

In order to decide how much credit and weight you give to any opinion testimony you need to consider what definitions the witness was using for words such as "sudden," "abrupt," "unexpected," and "unintended," and whether those definitions were the same as or different from the meaning of the same or similar words and phrases as used by the contracting parties and as used in the legal rules I explain to you in these instructions.

Finally, in determining the meaning of words and phrases as used in a contract, including an insurance contract, you should approach the matter in the spirit and with the purpose of interpreting the contract to be consistent and compatible with the objective manifestations of meaning in the terms of the contract, as far as possible.

Now, I turn to some added instructions for you to bear in mind as you think about the meaning of the following words and phrases that are used in question 2:

accident

sudden

sudden and accidental

caused by

arising out of

unintended and unexpected.

I begin with the word "accident." This word appears in the policy definition of "occurrence." The definition of "occurrence" in the policy begins, " 'occurrence' means an accident, . . . ." Bear in mind these four words at the beginning of the definition as you think about the rest of the definition of "occurrence."

The phrase that immediately follows, "including continuous or repeated exposure to conditions," tells us that a continuous or repeated exposure to conditions may be within the definition of "occurrence." It does *not* tell us that every continuous or repeated exposure to conditions is within the definition of "occurrence." To be within the definition of "occurrence" it must be a continuous or repeated exposure that is an accident. The meaning of "occurrence" does not include a repeated or continuous exposure that is not accidental.

To define "sudden" as it is used in the phrase "sudden and accidental," I am going to quote to you (with some modifications) from the definition provided in a decision of the Supreme Judicial Court of Massachusetts.

"Sudden" has a temporal aspect to its meaning, and not just the sense of something unexpected. The abruptness of the commencement of the release or discharge of the pollutant is *the crucial element* in determining whether an event qualifies as "sudden."

The sudden event to which [this language] applies concerns neither the cause of the release of the pollutant nor the damage caused by the release. It is the release of pollutants itself that must have occurred suddenly.

While the cause of the release does not determine whether [this exclusion] is applicable, it may well be informative in deciding whether the release was abrupt.

For example, a sudden cause (like a pile driven into a gas tank), or the sudden development of a condition (like a ground shift that ruptures the piping) might guide the decision whether a given release of pollutants was due to a momentary event, and therefore, was abrupt.

[As another example,] the leak of gasoline from a tank may have begun slowly from a crack or small hole in the tank brought about by its aging, and then increased over time as the crack or hole widened. This type of release probably would not constitute a "sudden" event within the exception to the pollution exclusion clause.

However, it is also possible that the discharge of pollutants occurred as a result of a sudden cause or a rapidly developing condition. The fact that the discharge of the pollutants occurred over a lengthy period of time does not automatically mean that the suddenness element has not been met.

[You must consider] all of the circumstances of the release or releases in this case to determine whether the sudden and accidental exception is applicable.

I turn next to the phrase "sudden and accidental." As we think about the meaning of this phrase as used in this insurance policy, we must bear in mind a number of factors that will help us understand the meaning of this phrase in the policy and in the rules of law applying generally to insurance policies like this one.

Insurance policies concern possible but uncertain future losses, not losses that have already occurred.

Also, insurance contracts concern losses that are neither certain to occur or certain not to occur. Another way of expressing this point is that insurance concerns what we call fortuitous or accidental losses. This is such a fundamental point that the courts read insurance policies as meant to cover only fortuitous or accidental losses even if the point is not stated explicitly. The point is reinforced when it is stated explicitly, as it is in the definition of "occurrence" in this policy.

Now I turn to explaining the phrases "caused by" and "arising out of."

Both of these phrases are used in law and in legally enforceable contracts with a meaning that you cannot derive from the words alone. That is, the idea of "cause" (or related words such as "caused," "causing," "resulted," and "resulting") and the idea of "arising out of," as we use these ideas in law and in legally enforceable contracts, are concerned with connections that we make in our minds between one event that occurred (or circumstance that existed) at one time and another event that occurred (or circumstance that existed) at another, later time. Was the later event or circumstance "caused by" the

earlier event or circumstance? Did the later event or circumstance "arise out of" the earlier event or circumstance?

You will need to keep the following ideas in mind as you consider these questions.

First, the but-for rule, which I will explain in a moment.

Second, the substantial-factor rule, which I will explain after I have explained the but-for rule.

Third, other circumstances concerning foreseeability, expectability, and contemplation of the parties in a sense that I will explain in a few minutes.

None of these three ideas is a rigid rule that alone directs you to a clear YES or NO answer. They are guidelines—things for you to think about in deciding how to answer the question whether one event or circumstance was caused by or arose out of an earlier event or circumstance.

Also, "caused by" and "arising out of" are phrases that may have a distinctive meaning as they are used by the parties to a contract, in the particular context of their contractual relationship with each other.

For those reasons, you will need to pay close attention to this explanation of the three ideas that help us understand the meaning of these phrases. Keep these ideas in mind.

First, if property damage or another event or circumstance you are thinking about would have happened anyway for other reasons regardless of an earlier occurrence, then that occurrence is not a cause. This idea is more often expressed as a "but-for" rule rather than a "would-have-happened-any-way" rule. These are two different ways of expressing the same idea. Lawyers and judges seem to prefer the double negative form—that is, the way of speaking that says: to find that one event or circumstance was "caused by" an earlier event or circumstance you must find that the later event or circumstance would not have occurred but for the alleged earlier event or circumstance. Another way of expressing the point is to say, if the later event or circumstance would have happened anyway—regardless of an earlier

occurrence, then the earlier occurrence was not a cause of the later event or circumstance.

The second idea you are to take into account is whether the earlier event or circumstance was a substantial factor in bringing about the second event or circumstance. Was it more than just a minimal factor, and enough more to be thought of as a "substantial factor"?

The third idea has to do with foreseeability. Was the happening of something like this foreseeable from the point of view of an ordinarily prudent person in the position of the contracting parties at the time they contracted? The question is not whether one would foresee precisely the way it happened. Rather, could something of this type or kind be foreseen by an ordinarily prudent person in the position of the contracting parties?

Essentially the same idea is sometimes expressed another way. Was it "within the contemplation" of the parties that something like this would happen? That is, would reasonable persons in their position have expected that something of this type or kind would happen?

Of course, an event or circumstance may be "caused by" and may "arise out of" more than one preceding event or circumstance. In other words, an event or circumstance may have more than one cause. It is not necessary for you to find that the preceding event or circumstance was the sole or only cause. It is enough that it is one of the causes, is a substantial factor, and is foreseeable, or in the contemplation of the parties, in the sense I have explained.

It is the obligation of the plaintiff to prove by a preponderance of the evidence the causal relationship that the plaintiff asserts. You are not allowed to speculate on the question of causal relationship.

Finally, I turn to the definition of "unexpected and unintended."

In determining whether property damage is intended or expected, the inquiry is not whether the act causing the injury is expected or intended, but whether the property damage was expected or intended at the time the act was performed. Unintended conse-

quences of an act may be an occurrence, if other requirements of finding an occurrence are satisfied.

With these definitions and instructions in mind, you should answer each part of questions 2 and 3 by finding the facts, as supported by a preponderance of the evidence, as you weigh and evaluate the evidence.

[**Read Question 4**].

Question 4 concerns the duty of Atlantic Mutual to defend its insured against claims made under the policy during the 1979–80 period. Question 5, which I will not read, is just the same except it concerns the 1980–81 period.

You will note that Question 4 concerns "Potential Claims" by a governmental agency.

By the phrase "potential claim" we mean this: even if the PRP letter does not clearly state a claim covered by the insurance policy, it states a *potential* claim if, but only if, it includes sufficient information to support a reasonable inference that there is a significant likelihood that the claims asserted by the PRP letter will turn out, when matters are clarified in the proceedings initiated by the PRP letter, to include a claim that is covered under the insurance policy.

The term "potential claim" applies not only to tort or CERCLA claims made in PRP letters but also to tort or CERCLA claims made in a complaint filed in a court.

The definitions I gave you in the instructions to Question 2 apply to the terms and phrases in questions 4 and 5 also.

[**Read Question 6.**]

Question 6, which is about defense costs, will require you to go through several steps of analysis before you arrive at an answer.

I am asking you to answer this question regardless of how you answered any earlier questions because there are unsettled questions of law with respect to exactly how many of the first five questions must be answered in favor of the plaintiff in order for the plaintiff to be entitled to defense costs. It may be that some part of these unsettled questions of law will need to be decided by a higher court.

Now I will explain the duty to defend to you more fully than I have earlier. In general, the duty to defend means that the insurance company will provide a lawyer to defend the insured against claims that potentially could be covered under the policy. In some cases, the insurance company will use its own attorneys; in other cases the insurance company will pay the bills of an attorney selected by the plaintiff.

The duty to defend is generally determined by comparing

(a) the language of the policy, which defines the scope of the liability insurance coverage, with

(b) the allegations in the complaint (if a lawsuit has been filed) or allegations of claims (if some other form of claim has been made). In this case, PRP letters were used by the government agencies to make claims before any lawsuit was filed.

When the language of the policy and the language of a claim correspond, the insurer has a duty to defend the insured against that claim. That is, if it appears that the claim raised against the insured is one that potentially could be covered under the insurance policy, then the insurer has a duty to defend.

You can evaluate the correspondence of the policy language and the claim in the jury room by comparing the policy language of the insurance policy (plaintiff's exh. 11) with the claims made in the PRP letters (plaintiff's exhs. 170, 171, 172).

If no duty is shown on the basis of this comparison, then facts outside the complaint or claim may be taken into consideration. This is true, however, only if those facts were brought to the attention of the insurer by a written notice or in some other form of communication from the insured to the insurer or by facts known to the insurer in some other way.

Thus, if you are going to take into consideration facts outside the claim in order to determine whether there is a duty to defend, you must first determine whether or when those facts were brought to the attention of the insurer.

Ordinarily, the insurer has no duty to investigate before it has received a notice in some form from, by or for its insured by someone authorized to act for its insured. Even so, if even without an attempt to investigate on its part, the insurer does learn of facts that tend to show that a claim within coverage has been made, a court and jury take that knowledge into account when determining whether a duty to defend was triggered at a particular time.

Also, if facts coming to the insurer's knowledge in any way, together with a communication from, by or for the insured that is insufficient to give the insurer notice, are in combination sufficient that a reasonable insurer would have understood that a claim within coverage has been made, or would have understood that it was likely that further investigation would show that a claim within coverage had been made, the insurer then has a duty of reasonable investigation. In these circumstances the insurer is held legally accountable not only for what it had learned from the insured and from other sources, but also for any additional facts that it would have learned upon reasonable investigation. In these circumstances the duty to defend is triggered, however, only at the time that the reasonable investigation would have disclosed the additional facts necessary to showing that a claim or potential claim within the scope of the coverage had been made.

If you find that Atlantic Mutual had a duty to defend the insured, you must next consider what proportion of the total defense was Atlantic Mutual's responsibility. In other words, you must determine what proportion of the total defense costs were incurred as a result of claims or potential claims covered by the Atlantic Mutual policy.

This issue arises because of the possibility that the CERCLA claims against Interex involve some claims for which Atlantic Mutual is not responsible under its policy, either because the property damage was not of the sort that is covered or because the damage occurred in years other than the period 1979–1981 covered by Atlantic Mutual's policies. Thus, the CERCLA claims against Interex involved alleged waste disposal in different years for which at least three different liability insurers had issued policies to Interex, but also under each of those policies a dispute has arisen as to whether the liability insurance coverage did or did not apply to waste disposal as distinguished from other kinds of risks of liability of Interex to third parties.

For example, you heard evidence about a fire that occurred and caused damage at a time before Interex had an insurance policy with Atlantic Mutual. If you find that Interex has incurred defense costs based on defending against claims that are a result of this fire and not the result of property damage in the 1979–81 policy years, you should not charge those costs to Atlantic Mutual.

Thus, I instruct you that Interex has no right to impose on Atlantic Mutual the costs of Interex's defense against claims for property damage in years other than those for which Atlantic Mutual provided coverage. That is, Interex can not impose on Atlantic Mutual the costs of defending Interex against claims for property damage in a year other than the 1979–80 policy period or the 1980–81 policy period of the Atlantic Mutual policy.

Given these instructions, you must determine, based on the evidence before you, what proportion, if any, of the defense costs should be covered. I recognize that this is a difficult task because you do not have very much evidence on other claims made during other years, or claims made during the covered years that are not the sort of claim covered by the Atlantic Mutual policy. I instruct you, however, that you may not guess or speculate about a percentage but must come to a reasoned determination.

To assist you, and also to provide answers to unsettled questions of law, I am asking that you view this question from the perspective of both the plaintiff and the defendant. That is, question 6(a) asks you to assume that the burden is on the plaintiff to prove, by a preponderance of the evidence, what proportion of defense costs Atlantic Mutual should pay. If you find that there is insufficient evidence from which you can determine any percentage, even by finding that at least a certain percentage has been proved, then

you should place an X in the space marked "NO."

Similarly, question 6(b) asks you to assume that the burden is on the defendant to prove, by a preponderance of the evidence, what proportion of defense costs Atlantic Mutual should NOT pay. If you find that there is insufficient evidence from which you can determine a percentage, even by a finding that no more than a certain percentage is its responsibility, then you should place an X in the space marked "NO."

I instruct you as a matter of law that in this case the plaintiff corporation is not entitled to recover full defense costs incurred by plaintiff corporation unless

(1) in answering questions submitted to you, you have found that the government agencies made one or more claims or potential claims against Interex within the coverage of the Atlantic Mutual policy, and

(2) this court or a higher court decides as a matter of law that in these circumstances Atlantic Mutual has the burden of proving the extent of any part of defense costs it is not obligated to pay, and

(3) you find in answering question 6(b) that Atlantic Mutual has failed to meet this burden.

In considering what part, if any, of defense costs Atlantic Mutual is obligated to pay, you are to consider what defense costs are fairly attributable to claims or potential claims within Atlantic Mutual's coverage and what defense costs are fairly attributable to defense against other, non-covered claims or potential claims.

**[Read Questions 7, 8, & 9]**

The instructions I gave you when explaining question 1 about *actual* authority and *apparent* authority of some person to act for a corporation apply here also. I will not repeat them.

Question 9 includes the terms "good faith and fair dealing." Every insurance contract implies good faith and fair dealing between the parties to it. The implied covenant of good faith and fair dealing provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

"Willful" conduct means conduct that is intentional and by design in contrast to that which is thoughtless or accidental. A willful actor intends both his conduct and the resulting harm. It must be found that an actor had the specific intent to injure another for conduct to be called "willful."

\* \* \*

### FINAL JUDGMENT

#### February 2, 1995

Stipulations and interlocutory orders of dismissal having been entered in this case with respect to claims other than those of Interex against Atlantic Mutual, and the counterclaims of Atlantic Mutual having become moot in view of verdict and the judgment to be entered for Atlantic Mutual for the reasons stated in the Opinion of January 18, 1995, it is ORDERED:

Judgment for defendant Atlantic Mutual Insurance Company on all claims asserted by plaintiff, with costs.

All other claims (including counterclaims and cross-claims) of all parties are dismissed.